132 So.2d 111 (1961)
Elston S. BANKSTON
v.
AETNA CASUALTY COMPANY OF HARTFORD, CONN., et al.
No. 5373.
Court of Appeal of Louisiana, First Circuit.
June 30, 1961.
L. B. Ponder, Jr., Amite, for appellant.
Iddo Pittman, of Pittman & Matheny, Hammond, for appellees.
Before ELLIS, LOTTINGER, JONES, HERGET and LANDRY, JJ.
JONES, Judge.
Plaintiff instituted this suit for compensation for permanent total disability, reasonable attorney's fees and for medical and hospital bills. Defendants are plaintiff's employer, Davey Tree Expert Company, and the compensation insurer, The Aetna Casualty Company of Hartford, Connecticut.
It was agreed and stipulated between the parties prior to the trial that plaintiff sustained an injury on July 9, 1959 while in the course and scope of his employment; that such employment was of a hazardous nature and the amount of compensation was $35.00 per week which was paid through October 19, 1959. Thus, the question that remains for decision is whether or not plaintiff has established by sufficient evidence that he was disabled subsequent to October 19, 1959, the date of the last payment of compensation.
Plaintiff was employed by Davey Tree Expert Company as a ground man with the duty of trimming and removing limbs that had been cut from trees by other workmen. On July 9, 1959, he accidentally cut his right foot while using an axe and was treated by Dr. Epstein of Gonzales, who died prior to the trial of the case. Following the accident, the plaintiff worked for a period of twelve days at his regular employment, at which time he complained of some swelling and pain in his right foot. On August 17, 1959 he was sent by his employer to Dr. Louis Mayer, a specialist in surgery in Baton Rouge. This doctor referred him to Drs. Robert and Geheber, radiologists, for the purpose of having X-rays made of the injured foot. After an examination of these X-rays, Dr. Mayer reached the conclusion there was an accessory bone medial to the medical aspect of the tarsal navicular bone in plaintiff's right *112 foot. This bone, which was less than 1.5 centimeters in length, was pressing against the scar tissue which had been formed by the accidental cut, and being congenital and serving no useful purpose, was removed by Dr. Mayer on September 1, 1959. Plaintiff was discharged from the hospital two days later. It is plaintiff's contention that he continued to suffer from said injured foot and is presently totally and permanently disabled from doing the type of work he was doing at the time of the injury.
Defendants contend plaintiff was fully recovered on October 19, 1959 at the time of his discharge by Dr. Mayer and since that date he has been able to perform the work formerly done without disability. In the alternative, defendant contends that if plaintiff was in any degree disabled such disability was the result of a congenital defect and was in no way attributable to the accident of July 9, 1959.
Even though this is a compensation suit, the plaintiff carries the burden of proof, as in other civil cases, to establish his claim by a preponderance of the evidence and to a legal certainty. Williams v. New Amsterdam Casualty Company, La. App., 121 So.2d 760; Roberts v. M. S. Carroll Company, Inc., La.App., 68 So.2d 689.
In addition to the plaintiff's testimony to the effect that he was no longer able, due to his disability, to perform the duties of his employment, he produced the testimony of three doctors, viz.: Drs. I. I. Rosen and J. H. McClendon, Sr., general practitioners of Amite, Louisiana, and the testimony of Dr. E. A. Schexnayder, a general practitioner of Donaldsonville.
Dr. Rosen's deposition was to the effect that he had seen the plaintiff about ten times since October 7, 1959; that he made no X-rays of plaintiff's injured foot and his treatment consisted of a prescription of analdin for pain and having the plaintiff soak his foot alternately in hot and cold water to increase circulation. He noted that plaintiff complained of pain and swelling in the ankle and foot, particularly after any ambulating or standing. He found swelling of the ankle in the area of the incision. He was of the impression that plaintiff had a weak foot and that the arch support prescribed by Dr. Mayer was not a sufficient corrective even though he found the plaintiff had improved considerably prior to March 9, 1960. He still found some swelling as of that date in his rightfoot and felt that this was due to non-use. He was of the opinion the plaintiff was psychologically immature and the best therapy for the plaintiff would be to return to his job with lighter duties which could, be gradually increased and that within a period of six months the plaintiff would be able to carry on his former duties.
Dr. McClendon's opinion was based upon, one examination of the plaintiff, made on March 9, 1960, a few days prior to the trial. He noted a slight swelling in the area of the scar but, contrary to Dr. Rosen, was of the opinion that the foot should be given complete rest by placing it in a cast for six or eight weeks in an effort to alleviate the inflammation which caused the swelling. He was of the further opinion that the plaintiff could then proceed with the gradual use of his foot. Dr. McClendon did not make any X-rays of the foot but was of the opinion that tendons in the foot were apparently cut at the time of the accident. He fixed plaintiff's degree of disability at fifty per cent at the time of his examination.
Dr. Schexnayder's testimony was also based upon a single examination of the plaintiff, made on March 10, 1960. Even though he found both of plaintiff's feet were pronated, he further found there was a more marked pronation of the right or injured foot. Contrary to Dr. McClendon and Dr. Rosen, he did not find any swelling around the area of the incision. It is significant to note that plaintiff testified his ankle and foot would swell late in the afternoon, however, he was examined by Dr.
*113 Schexnayder at six o'clock on the afternoon of March 10th when no swelling was found. This doctor further testified that the removal of the accessory bone had a beneficial effect on plaintiff's foot but that he should wear arch supports because of his congenital flatfootedness. He testified plaintiff could not work on the foot for an eight hour day and the accident had aggravated plaintiff's congenital flatfootedness. It was his opinion plaintiff could not discharge the duties of his former employment.
During the course of the trial plaintiff removed his shoes and Dr. Schexnayder pointed out to the court the scar on plaintiff's foot which was about an inch and a half long. During observation of plaintiff's foot, no mention was made by the court or this doctor of any swelling existing in this foot.
Defendant filed in evidence the deposition of Dr. Louis Mayer, a specialist in surgery who removed the accessory bone, and Dr. J. Willard Dowell, an orthopedic surgeon. The testimony of Dr. Mayer reflects plaintiff was sent to him at the request of plaintiff's employer and, after X-rays and examination, he felt the proper thing to do was to remove the accessory bone which was pressing out against the scar tissue, formed as a result of the accidental laceration of the plaintiff's right foot. Accordingly, such operation was performed by him on September 1, 1959 and plaintiff was discharged from the hospital on September 3rd. On September 11th plaintiff was taken off crutches and on September 18th Dr. Mayer sent him to a shoe store to purchase arch supports as a corrective for plaintiff's congenital flat feet. On October 6, 1959 Dr. Mayer released plaintiff for light work and advised him to wear high top shoes and arch supports. On October 14, 1959 the doctor again saw this plaintiff who advised him that his right foot swelled but the doctor could not find any swelling on said date. Plaintiff was discharged by Dr. Mayer on October 14, 1959 as able to perform the duties of his prior employment. Plaintiff was last seen by this doctor on March 3, 1960, at which time the "faintest swelling" was noticed but the doctor attributed no significance to this condition.
Dr. Dowell examined plaintiff on February 22, 1960. His examination revealed a well healed scar, about one and one-half inches in length, over the medial aspect of the foot in the area of the navicular bone. Plaintiff complained of pain when pressure was applied over the area. This doctor found slight swelling distal to the scar and there was a slight depression of the longitudinal arch. He found plaintiff had a slight prominence of the dorsum of the mid-tarsal area of each foot. He found a full range of ankle motion and noted no evidence of atrophy in the calf muscles. X-rays which had been previously made by Drs. Robert and Geheber were reviewed by Dr. Dowell which revealed an accessory bone medial to the medical aspect of the tarsal navicular bone. He further made X-rays in his office which revealed that this accessory bone had been satisfactorily removed. Dr. Dowell was of the opinion plaintiff had made a satisfactory recovery. However, on the basis of the slight swelling which he found, he was of the opinion plaintiff had a disability of five per cent of the right foot. He further testified this slight swelling would subside within a short time and that plaintiff would have no residual disability as a result of the injury. He was of the opinion plaintiff was able to return to the same type work he was doing as a woodcutter and the slight disability which he had found in the foot would in no way interfere with this type of work.
The principle is well established that the testimony of a specialist in a particular field of medicine to which plaintiff's injuries are related is entitled to greater weight than the opinion of a general practitioner. Williams v. New Amsterdam Casualty Co., supra, and cases therein cited. It is a further well established principle that the testimony of a physician first *114 examining or treating the injured party is usually entitled to greater weight than the opinion of a doctor who examines the plaintiff at a later date. It is apparent that the testimony of Drs. Rosen, McClendon and Schexnayder was based on the belief that the tendons or ligaments in plaintiff's foot had been cut or injured from the cut by the axe. On the other hand, Dr. Mayer, when he performed the operation on the plaintiff to remove the accessory bone, found that none of the tendons or ligaments in his foot had been injured. As a matter of fact, the cut on the plaintiff's foot was only an inch and a half long and the only reason he was suffering subsequent to the accident was due to the fact the accessory bone was protruding against the scar tissue formed by the wound from the axe. Obviously Dr. Mayer believed when he removed this accessory bone the cause of the pain was removed and that plaintiff suffered no pain subsequent to said operation. It is true, as testified by Dr. Rosen, that the circulation in plaintiff's foot was somewhat impeded but he felt that by use of the foot plaintiff would completely recover. Further than this, Dr. Mayer prescribed arch supports which would have hastened plaintiff's recovery and, which, it is apparent, he did not use except to a limited extent and, accordingly, failed to cooperate with the doctor. Dr. Willard Dowell is an orthopedic specialist and while he did not see the plaintiff except on one occasion he not only made and examined X-rays of the foot but he also examined X-rays which had been made prior to the operation by Dr. Mayer. His examination was more thorough than that of the general practitioners, Rosen, McClendon and Schexnayder, and we believe his opinion is entitled to greater weight as a specialist in his field than that of the general practitioners who testified in this case. He as well as Dr. Mayer was of the opinion that as of the date of his discharge by Dr. Mayer in October, 1959 plaintiff could perform, without pain, the same duties he was performing prior to the accident.
Plaintiff seriously contends that since there is a conflict in the medical testimony, this court should be guided by the testimony of four lay witnesses who were produced on the part of the plaintiff. This is ordinarily true. However, in the present case, the District Judge who rendered exhaustive written reasons for judgment and who was in a better position than are we to evaluate the testimony of said witnesses found as follows:
"The testimony of several lay witnesses was offered to substantiate the claim of total and permanent disability but their testimony is so vague and general, and based upon such brief observations of Bankston, as to be practically worthless."
We further note in the District Judge's written reasons denying application for a rehearing he commented as follows:
"A total of four (4) lay witnesses were called in plaintiff's behalf. The first of these, Elliott Steward, plaintiff's `uncle by marriage,' testified with regard to Bankston: `I don't really know if he worked regular or not. * * *' (Transcript, p. 26). Ernest Willard W. Harris testified as follows (Transcript, p. 29):
"Q. Prior to the time of this injury did he work at various industrial employment jobs? A. Not as I ever seen him, no, sir.

* * * * * *
"Q. Do you know what type of work he was doing when he was working for Davey Tree Company and at the time he was injured? A. No, sir, I don't know.
"As might be expected, the testimony of two cousins of the plaintiff, Lloyd O. Bankston and Earl P. Kinchen, is somewhat more positive. However, even their testimony is of a very general nature and simply to the effect that while the plaintiff worked *115 prior to his injury he has not worked since then, and that he now walks with a limp. None of these witnesses were able to assert positively that the plaintiff's injury is the reason why he is not now working. Such vague generalities cannot prevail in light of the positive medical testimony before the court."
We not only are not in position to say that the District Judge committed manifest error in his evaluation of the testimony of these witnesses but from a careful reading of their testimony we believe his evaluation to be correct.
Accordingly, for the reasons stated, we are of the opinion that the judgment of the District Court is correct and it will be affirmed at plaintiff's costs.
Affirmed.