152 So.2d 1

Louis J. GUILLORY

v.

NEW AMSTERDAM CASUALTY
COMPANY et al.

No. 46258.

March 25, 1963.

Rehearing Denied April 29, 1963.

Jesse S. Guillot, New Orleans, for plaintiff-appellee, applicant.

James E. Glancey, Jr., Stanley E. Loeb, New Orleans, for defendants-respondents.

SUMMERS, Justice.

This suit for workmen's compensation was instituted by the plaintiff, Louis J. Guillory, against his employer, Felix Bonura Company, and its insurer New Amsterdam Casualty Company, for compensation due on account of injuries which were alleged to have occurred on April 8, 1958. The trial court without assigning written reasons, rendered judgment in favor of the plaintiff workman awarding compensation for the duration of his disability, not however beyond four hundred weeks, commencing April 8, 1958. This award was

subject to a credit of $204.27 for compensation previously paid, plus $236.00 as medical expenses. The judgment further directed that the fees of plaintiff's medical experts be assessed as costs, which the defendants, the employer and his insurer, were condemned to pay.

From this judgment defendants appealed to the Court of Appeal, Fourth Circuit, where the judgment was reversed. (141 So.2d 493). Upon the application of plaintiff, we granted certiorari to review the judgment of the Court of Appeal.

Our study of the evidence discloses these facts. The plaintiff, who was then 47 years of age, was employed as a carpenter by the defendant, Felix Bonura Company, a corporation and owner of Magnolia Broilers. This firm was a wholesale business establishment engaged in poultry eviscerating in the city of New Orleans. Plaintiff's employment required that he repair chicken coops used in transporting live poultry. These coops or cages were light in weight, about eighteen or twenty pounds, and were partly made of wooden slats or bars. While cutting wood slats on April 8, 1958, with a power saw, plaintiff's left thumb came in contact with the saw and the fleshy part on the thumb's extremity was cut away. Plaintiff testified, though this portion of his testimony is contradicted, that as a result of cutting his thumb, he fell backward in a sitting position and struck the lower

part of his back on a platform scale. He felt no pain in his back at that time. He was taken, by Irving Peter Lawlee, a fellow employee, to the office of Dr. Dan D. Baker in New Orleans for treatment of the thumb laceration. Dr. Baker cleaned and sutured the wound and applied a dressing. Plaintiff continued under Dr. Baker's treatment, visiting his office about every other day until May 28. He was paid compensation during this period and medical expenses. It was during this period, on April 21, 1958, the thirteenth day after cutting his thumb, that plaintiff first complained of pain in his back and recounted to Dr. Baker that he had fallen against the scale. Whereupon X rays were made by Dr. Baker of the thumb and back. X rays of the thumb showed no positive dislocation or bone pathology; and, although plaintiff complains of tenderness and pain in the thumb which disables him from returning to carpentry work, we find no merit to this complaint and none of the medical doctors support plaintiff's claim relating to the thumb.

The X rays of the lumbar spine, made in Dr. Baker's office as a result of plaintiff's complaint of pain in that region, showed no fracture or bone pathology. The X rays, however, were made by a technician in the office and unfortunately did not involve the area where it was subsequently discovered that plaintiff had a condition of spondylolisthesis. Dr. Baker gave plaintiff no treat-

ment for his back and discharged him as able to return to work on May 28, 1958.

Upon being discharged, plaintiff returned to work at the broiler plant. At this time his work involved fabrication of small boxes requiring standing, stooping and handling of the boxes, which, apparently was no less strenuous than the work he performed previously. It appears that he continued in this work until June 13, 1958, after which he testified that he went to work for Pinkerton Detective Agency as a guard on various assignments. In August, 1958, plaintiff fell to the ground from the steps of a public service bus and injured his ankle when it became entrapped in a door. As a result of this accident, he received medical and hospital treatment for this injury and a settlement of $400.00. He remained in the employ of Pinkerton, according to his statement for "about one year." He quit this work, he says, because a guard assignment at the Todd Dry Docks on the Mississippi River required that he walk and climb a levee, and he was unable to negotiate the levee.

When plaintiff left the employ of Pinkerton on September 16, 1959, he obtained employment at Plymouth Cordage Company. This was a rope factory and required stooping and lifting which plaintiff said he could not do. He worked one night and quit. This suit was filed on September 24, 1959.

Meanwhile on June 23, 1958, plaintiff sought and obtained an examination from Dr. O. L. Pollingue. His complaint to Dr. Pollingue was of pain in the low back from the center down, going into the right hip. Dr. Pollingue caused X rays to be made of the lumbosacral region of plaintiff's back, which revealed a first degree spondylolisthesis with marked narrowing of the interspace. Dr. Pollingue's opinion at this time was that plaintiff should continue his previous occupation and advised that he wear a lumbosacral support while at work. This would give added support, permit plaintiff to remain active and maintain the tone of his body musculature. Dr. Pollingue observed at that time that plaintiff had an excellent range of motion; and no spasm in the erecti spinous muscles.

Plaintiff was again seen by Dr. Pollingue on October 13, 1958, at which time plaintiff complained that his back was going from bad to worse. A myelogram was advised to be performed by a neurosurgeon, consequently Dr. Pollingue deferred any opinion of plaintiff's condition until a report of the myelogram was available to him. The report or X rays of the myelogram were never made available to him.

Plaintiff was next seen by Dr. John A. Colclough in New Orleans on November 20, 1958, at which time plaintiff's complaint was pain in the back and lower right extremity. He was not examined at that time, but on December 9, 1958, Dr. Colclough made a clinical examination and

his diagnosis was that plaintiff had a herniation of the fifth lumbar intervertebral disc, causing a sciatic pain on his right side, together with a defect in the fifth lumbar vertebra with minimal, (the slightest of four degrees), spondylolisthesis. He recommended a myelogram. Plaintiff was not seen by Dr. Colclough again until November 11, 1959, more than eleven months later, for the purpose of making a myelographic examination. The delay in making the myelogram was explained to be due to the fact that Dr. Colclough was ill and hospitalized in the interim. The myelogram was performed together with Dr. George G. Willis, a radiologist. This involved fluoroscopic examination and X rays and resulted in a finding of a "defect" on the left side of the spinal canal about three centimeters in length at the level of the joint space between the fifth lumbar and first sacral vertebra. A "defect" is a protrusion into the spinal canal. Later, on the morning of the trial, upon reviewing the X rays, Dr. Colclough observed evidence of blocking off of the nerve on the patient's right side. This latter observation, unlike the first, was not made in conjunction with the fluoroscopic examination conducted at the time of the myelographic examination. The three centimeter defect on the left, which was first observed, was then thought to be produced by the needle inserted into the spinal canal in connection with the myelographic procedure.

Such defects occur, according to Dr. Colclough, when the needle distorts the dural sac, or, according to other medical testimony, when a blood vessel is punctured by the needle causing blood to accumulate at the sight of the needle. This accumulation of blood has the appearance of a defect. Because of the suspicion that this defect might be attributable to these causes, the needle was removed, the plaintiff was refluoroscoped that same day and the defect persisted.

Dr. Colclough asserts that the spondylolisthesis which he found verified by the myelogram is the slipping of one vertebra in relation to another and that it is congenital in origin. Such a condition is said to be a structural defect in the spinal column, wherein the bony formation is imperfect. It, therefore, existed in plaintiff for many years, long prior to the questioned injury. The only issue, therefore, aside from the pain in the thumb which we have discounted, according to plaintiff's own medical evidence, is whether this condition of spondylolisthesis has been aggravated or whether any other condition such as a herniated disc has occurred as a result of the questioned accident.

In the meantime, after Dr. Colclough's first examination in November and December, 1958, and prior to the myelographic examination in November, 1959, almost a year later, the plaintiff was examined by Dr. James L. LeNoir on March 17, 1959, by

Dr. Richard Henry Corales on March 23, 1959, and Dr. Hyman Soboloff on September 11, 1959. The X ray plates made by Dr. Willis and Dr. Colclough were reviewed by Dr. Charles M. Nice, Jr., though he did not examine plaintiff.

Dr. LeNoir examined the plaintiff and made X rays of his back. These revealed evidence of spondylolisthesis, which he described as a congenital defect of the bony structure of the fifth lumbar vertebra with a forward displacement of slight degree of the fifth lumbar on the first sacral vertebra. There was no other evidence of bone or joint pathology noted. He diagnosed the spondylolisthesis as being of the developmental type and of long standing, since plaintiff's birth. It was his opinion, in explanation of the complaint referable to plaintiff's right lower extremity, that the possible or questionable nerve root compression producing the pain was probably stretching or tension of the nerves due to syondylolisthesis, rather than the possibility of a herniated disc as a cause for this phenomenon. He asserts that the decreased sensation throughout the right half of plaintiff's body is positively not of an organic nature.

Dr. LeNoir states that when an injury occurs to a back it would be reasonable to expect the injured party to voice a complaint that same day, especially if it involved a tearing of the soft tissue interposed between the two vertebra at the site

of the spondylolisthesis. There was no muscle spasm or evidence of nerve root compression at the time of this examination. Muscle spasm, according to his testimony, is manifest when pain is severe. There was no evidence of ruptured intervertebral disc, nor complaints suggestive of such. He also examined the X ray plates taken at the time Dr. Colclough performed the myelogram on plaintiff and attributed the defect on the left shown thereon to have occurred in conjunction with the spinal needle inserted in position at that point. The second film taken after the removal of the needle was not sufficiently removed in point of time to permit the defect to clear up. Technically, his opinion was that the showing was inconclusive. His testimony is to this effect:

"Now, I don't believe that the defect I see on the myelogram has anything to do with a ruptured disc, and I don't think it has anything to do with existence of spondylolisthesis or narrowing of the fifth interspace. It is my opinion that is purely a technical error produced by the insertion of the needle. Now, another point is this defect at the point of this needle is to the left side. This patient's complaints are all on the right side."

This doctor attributes plaintiff's disability to do heavy work, which he concedes, to the spondylolisthesis which can only be

remedied by spinal fusion. In his opinion, however, plaintiff could continue to perform the work he had been doing at the time of his alleged injury.

Nor could he find any evidence of an aggravation having occurred in recent times, at least prior to April 8, 1958, and he attributed the disabling condition to a degenerative process of long duration.

Dr. Corales, who examined plaintiff on March 23, 1959, concluded after a neurological examination that spondylolisthesis existed. He found a lesion within the right side of the sacrum considered benign and most likely fibrous in origin, and not related to the symptoms of pain. Though he found evidence of nerve root compression, he did not attribute it to a ruptured intervertebral disc.

On reviewing the X ray plates made on the occasion of the myelographic examination by Dr. Corales, he concurred in the finding of the long defect on the left side and attributes it, as did Dr. LeNoir, to the insertion of the needle at that juncture. In his experience he has never found a ruptured intervertebral disc at the level of the spondylolisthesis.

Dr. Hyman Soboloff, a specialist in orthopedic surgery, examined plaintiff on September 11, 1959. As a result he noted the spondylolisthesis with early evidence of lumbosacral joint disease, meaning arthritis, primarily, which is a congenital malformation, without any evidence of fracture. In his opinion the back condition was not caused by an accident nor was it a result of an accident, but a gradual process of long duration. It was his position that plaintiff could return to the same work. An examination by him of X rays made of plaintiff's back showed no evidence of aggravation of the back condition. In connection with the X rays made for Dr. Colclough he attributes the defect shown there to the insertion of the needle which would have healed in six weeks after the myelogram; it is not an injury and has no detrimental effect, and would not show up in any subsequent X ray. In his opinion plaintiff can continue the same work he was doing. Dr. Soboloff considers it possible that the fall from the bus in August, 1958, could be the cause of the pain of which plaintiff complains. Nor does he feel that a fluoroscopic examination is more important than X rays. For what is shown by fluoroscope is shown on the X rays, unless it is so transient that it is seen on the fluoroscope and not on the X ray in which event it would not be a proper basis for a diagnosis. His experience, like that of the other doctors, is to the effect that a ruptured disc is never found at the site of the spondylolisthesis.

The factual issues thus presented are whether plaintiff suffered an accident on April 8, 1958, and whether as a result of this accident his back has been injured to such an extent that he is disabled.

Clearly an accident occurred on the date in question, involving plaintiff's finger, and he has been paid compensation therefor. But the accident involving the back is separate and distinct and is predicated on plaintiff's testimony alone. This testimony is contradicted by Irving Peter Lawlee, a co-employee of the plaintiff, who testifies that he was near plaintiff at the time when the saw blade cut his thumb and that plaintiff positively did not fall against a scale. If Lawlee's testimony is to be believed, it negatives an accident to plaintiff involving his back, which is the very foundation of his claim. Another very pertinent circumstance is that plaintiff made no complaint of any back pain for thirteen days, although the medical evidence preponderates to the effect that such a fall and injury as plaintiff claims would result in pain either immediately or promptly thereafter.

Other than the accident plaintiff must establish that he has been disabled and that the disability is causally connected with the accident incurred in the employment. The medical evidence unequivocally proves that plaintiff has a condition in his back known as spondylolisthesis and that he had this condition probably since birth. The evidence of the "defect" found on the X ray plates which would have established an aggravation of this condition is unimpressive. The testimony of the medical experts convinces us that what appeared to be a defect was merely a temporary protrusion or bleeding resulting from the insertion of the needle in connection with the myelographic examination.

Aside from the medical evidence which we have accumulated in this opinion and which we consider pertinent to this issue, there are other relevant facts and circumstances.

The doubt of the happening of an accident created by Lawlee's testimony and the doubt created by the medical evidence of the causal connection of the spondylolisthesis with the questioned accident is further strengthened by plaintiff's testimony that he sought employment with the Pinkerton Detective Agency when he left the employ of Magnolia Broilers. This testimony avoided disclosing facts brought out by the defense indicating that plaintiff was employed by that agency during the same time he was employed by Magnolia Broilers; and, apparently, he was holding two jobs even after his alleged injury. The guard job he had for so long a time after April 8, 1958, did involve making the rounds of the area assigned to him and required considerable walking and stair climbing.

There is testimony and motion picture evidence which discloses that plaintiff drove a tractor shortly prior to the trial. Other testimony, though denied by plaintiff and his witnesses, is to the effect that he plowed behind a mule clearing brush on a farm near Cottonport.

In its opinion, the Court of Appeal found: "Although plaintiff professes his pains were constant, after being discharged by Dr. Baker on May 28, 1958, he sought no medical advice at all until November 20, 1958 (about seven months after the accident), when he called upon Dr. John Colclough, a neurological surgeon, who examined him on December 9, 1958, but never treated him." On the other hand, our review substantiates the fact that plaintiff did seek medical advice prior to November 20, 1958, for he visited Dr. Pollingue on June 23, 1958, and October 13, 1958 as we have shown. But this factor alone does not alter the result reached by the Court of Appeal. Its decision, like ours, was based upon the failure of the plaintiff to establish his claim by a preponderance of the evidence. The inadvertent statement of that one factual circumstance does not balance the scale in plaintiff's favor.

■ Even though this is a compensation suit, plaintiff bears the burden of proof, as in other civil cases, and must establish his claim by a preponderance of the evidence and to a legal certainty. See Bankston v. Aetna Casualty Company et al., La. App., 132 So.2d 111 (1961), and cases cited therein. What is meant by this rule is that plaintiff in a compensation suit is required to make out his case by a preponderance of the evidence and with the same legal certainty as required in any other civil case. It follows from this, that speculation, conjecture, near possibility, and even unsupported probabilities, are not sufficient to support a judgment. Green v. Heard Motor Co., 224 La. 1078, 71 So.2d 849 (1954); Henderson v. New Amsterdam Casualty Company, La.App., 80 So.2d 438 (1955). Though in compensation cases some of our ordinary rules and procedures are relaxed and liberally construed in favor of the employee, the above rule as to the burden of proof has been held to apply. Moore v. Employers Liability Assurance Corp., La. App., 124 So.2d 804 (1960); Malone, Louisiana Workmen's Compensation Law and Practice, Sec. 252 (1951 2d ed.).

■ The record reflects that plaintiff's case rests on his own unsupported and, in fact, contradicted testimony that he fell and struck his congenitally defective back. If he did fall, the medical evidence does not preponderate to the effect that the congenital condition in his back was aggravated.

■ The law does not sanction a finding of fact based upon conjecture. And to find that the condition of which plaintiff complains has any causal connection with his employment would involve just that.

For the reasons assigned, the judgment of the Court of Appeal is affirmed.