HOOD, Judge.
This is a workmen’s compensation suit instituted by Louis Johnson against W. C. Fatjo, Inc., and its insurer, Hartford Accident and Indemnity Company, in which plaintiff claims benefits based on permanent and total disability, together with penalties and attorneys’ fees. Defendants answered denying liability, and alternatively pleading prescription. After trial on the merits, the district court overruled the plea of prescription and awarded compensation for a period of approximately eighteen months, subjct to a credit for wages paid in lieu of compensation. Both plaintiff and defendants have appealed, plaintiff demanding an increase in the amount of the award and defendants demanding that all of plaintiff’s claims be rejected.
Plaintiff began working for the Fatjo Company in 1958 as a tool pusher on an oilfield drilling rig. On July 30, 1960, while assisting some of his co-workers in starting a large gasoline engine, the engine backfired causing plaintiff to be struck on the left side of his body by a wrench and a piece of pipe which were being used in starting the motor. The blow was of sufficient force to knock plaintiff unconscious for a few minutes. He was taken to- a hospital where he received immediate medical treatment, and since that time he has been examined and treated by other doctors.
Plaintiff alleges that as a result of the accident he sustained a “concussion of the brain and contusions of the chest and a broken elbow, wrenched shoulder and injury to his neck,” which injuries he claims became progressively worse until about August 8, 1961, when his pain became so severe that he could no longer carry on his work. In the brief submitted in behalf of plainiff *783 on this appeal, it is argued that “plaintiff’s present disability is due both to a hysterical conversion and also to the irritation of the occipital nerve as a result of injuries to the neck received in the accident.” Defendants’ position, in substance, is that plaintiff did not sustain a disabling injury in the accident which occurred on July 30, 1960, and that there is no causal relationship between the accident and any disability which he may now have. Alternatively, defendants contend that plaintiff is barred from recovery by prescription.
The evidence establishes that on the day of the accident and immediately after it occurred plaintiff was examined by Dr. W. I. Smith, Jr., a general practitioner, who diagnosed his condition as cerebral concussion. On the following day, however, the doctor released plaintiff as being able to return to work on August 2, 1960, “if he continued to feel well.”
Three or four weeks before the accident occurred plaintiff was treated by Dr. J. W. Swafford, of Sulphur, for complaints of “severe frontal headaches and nose occluded.” On August 5, 1960, or a few days after the accident, he consulted Dr. Swaf-ford complaining of being “sore and stiff,” and on that date he was given a prescription for a muscle relaxant. He again consulted Dr. Swafford on August 17, I960, with complaints of “severe frontal and occipital headaches and couldn’t sleep.” After a brief hospitalization and x-ray examination, Dr. Swafford concluded that plaintiff was suffering sinusitis, “since his complaints were similar to those of S July 1960, one month before the accident.” Plaintiff was treated for the next two days with penicillin shots, nasal spray and Sinutabs, and he was released on August 19, 1960.
Plaintiff returned to work for defendant Fatjo Company during the latter part of August, 1960, and he continued to work for defendant as a tool pusher, without any complaints of injury or disability to his employer, to his co-workers, or to a doctor, for a period of almost one year, until the latter part of July, 1961. Plaintiff testified,, however, that he began suffering pain in his neck, left shoulder and left arm and he began having severe headaches about three months after the accident occurred. He states that he continued to work in spite of the pain and that he made no complaints to his employer because he was afraid he would be fired. He concedes that he did not seek or obtain medical treatment for any of these complaints until a little more than one year after the accident.
During the latter part of July, 1961, or about one year after the accident occurred, plaintiff suffered a severe kidney stone attack while he was on the job. Pie was immediately hospitalized and was treated by Dr. Harold B. Lovejoy, a specialist in internal medicine. Five days later he was relieved by the passing of the stone, and he thereupon was released from the hospital and was given a “return to work” slip by the doctor on August 3, 1961, although the doctor noted that he was complaining of “nervousness” at that time.
On August 8, 1961, plaintiff returned to work for defendant Fatjo, but he was promptly notified that he was being discharged from his employment on that day, although his pay was continued until August 22, 1961. Plaintiff thereupon informed defendant that he had hurt his arm in the accident which occurred on July 30, 1960, a little more than a year prior thereto, and he inquired as to whethér he could get it “fixed.” This was the first information which defendant had received as to the alleged injury to plaintiff’s elbow. Defendant interpreted plaintiff’s statements as being a request for compensation payments, and the request was refused.
Plaintiff then returned to Dr. Lovejoy on August 14, 1961, complaining of a painful arm and swelling in the elbow, and he was immediately referred to Dr. George B. Briel, an orthopedic surgeon. X-rays made by Dr. Briel showed “a spur to be present which appeared to be an osteophyte from previous trauma located at the proximal *784 end of the olecranon and located in the tendon of the triceps muscle.” Also, on his first examination Dr. Briel diagnosed plaintiff’s condition as a probable cervical disk herniation and irritation of the nerves emanating from the region of cervical 3 and cervical 4, but further examinations convinced Dr. Briel that this diagnosis was erroneous.
Dr. Briel then, by surgical procedure, removed the spur in plaintiff’s left elbow, and we agree with the trial judge that the evidence shows that plaintiff recovered from any disabililty relating to the elbow by January 27, 1962. While under Dr. Briel’s care, however, plaintiff began having dizzy spells and on several occasions he experienced “blackouts.” Dr. Briel discharged him from the hospital on August 28, 1961, but referred him to Dr. M. E. Faulk, Jr., a neurosurgeon in Beaumont, Texas, because of his complaints of headaches, dizziness and blackouts.
Dr. Faulk stated that upon plaintiff’s arrival at the Beaumont Hospital on August 28, 1961, he seemed a “little confused” but otherwise he was pretty well normal. An examination revealed that plaintiff had an occlusion of the base of the right internal carotid artery, which occlusion had existed for a period of not more than one month, and it had no connection whatsoever with plaintiff’s employment or with an accidental injury which he may have sustained. An operation to remove the blood clot was performed by a vascular surgeon, and almost immediate improvement in plaintiff’s condition was noted. He was discharged from the hospital in Beaumont about September 15, 1961, and by that time he had lost most of the weakness and sensory difficulty which he had experienced. Dr. Faulk stated:
“This patient’s diagnosis seems to be that of local arteriosclerosis with thrombosis of the right internal carotid artery. His condition seems to have have been fairly well corrected by surgery.”
Plaintiff returned to Dr. Briel several times during the month of October, 1961, for physiotherapy and ultrasonic treatments to the shoulder and exercises to both shoulder and neck. He was discharged on October 21, 1961, and thereafter was examined again by Dr. Briel on November 18, 1961. Dr. Briel felt that plaintiff’s condition was greatly improved at that time, and that he could have then performed, work of a supervisory nature, although he was still unable to resume work of a strenuous character as he had not yet fully recovered from the surgery and treatment which he had received. The doctor assigned a “mild degree” of disability as a result of the elbow condition, but felt that plaintiff would be fully recovered in “six to eight or ten weeks.”
This lawsuit for workmen’s compensation benefits was instituted on December 1, 1961, or about sixteen months after the accident occurred.
Plaintiff thereafter became very much depressed, and was referred by Dr. Love-joy to Dr. Barclay Funk, a psychiatrist of Lake Charles, and he was admitted to St. Patrick’s Hospital in Lake Charles on January 31, 1962. Dr. Funk’s diagnosis was that plaintiff was suffering from a severe anxiety reaction manifested by depression, which depression was caused primarily by loss of employment, periods of “blacking out,” the series of organic physical illnesses which befell plaintiff and fear of permanent disability. Dr. Funk testified that he thought permanent brain damage had resulted from the occlusion of the carotid artery. He also felt that plaintiff, because of his mental condition, was permanently disabled from performing the. work of a tool pusher, since he can no longer accept the responsibility attached to that position, although he could perform work under the supervision of others where* the physical activity would be moderate.
On May 10, 1962, plaintiff was examined' by Dr. Ford J. Macpherson, an orthopedic surgeon of Shreveport, who observed thaj; *785 plaintiff was “intensely interested in himself,” or a person who. “constantly refers to his ailments and physical complaints during the course of the examination.” He found nothing to suggest a ruptured disk in the neck, but he did find a residual occipital neuralgia, slight mental inadequacy and minimal weakness in the left arm. He also found “what appeared to be a state of depression, probably following a period of inadequate brain circulation while his artery was clotted, which I don’t think was directly related to his injury in 1960.” We interpret Dr. Macpherson’s testimony to be that in his opinion the occipital neuralgia, manifested by head and neck pains, resulted from the accident which occurred in 1960, but that the other disabling conditions, consisting of mental inadequacy and weakness of the arm, resulted from the occluded carotid artery and were not in any way related to the accident or employment.
In its written opinion, the district court stated:
“All of the physicians agree that the plaintiff, at the time of the trial, was permanently totally disabled from performing his duties as a tool pusher for his employer. However, the serious question arises as to whether or not this condition can be attributed to the accident of July 30, 1961. * * * The physicians all agreed that the carotid artery difficulties were not attributable to the accident.
Jjt íH sjs % * *
“This Court concludes that the elbow condition was attributable to the trauma received in the accident of July 30, 1960, which manifested itself to a disabling extent in August of 1961. Thus his right of action had not prescribed when suit was filed December 1, 1961. The plaintiff continued to suffer the disability until January 27, 1962, which disability resulted from the accident. Disability following that time was due to the carotid artery condition and the adverse effects suffered by the plaintiff as the result thereof, which condition was not connected with the injury received in the accident of July 30, 1960.”
We agree with the trial judge that plaintiff is now totally disabled from performing the work of a tool pusher because of his present state of mental depression and because of the brain damage which apparently resulted from the occluded carotid artery. We also are convinced that he was disabled because of a spur or osteophyte on the left elbow from August 14, 1961, to January 28, 1962. One of the important questions presented on this appeal, however, is whether there is a causal relationship between plaintiff’s disabilities and the accident which occurred on July 30, 1960.
The jurisprudence of this State is settled to the effect that a claimant in a compensation proceeding bears the burden of proving by a preponderance of the evidence a causal connection between the work-connected accident and his alleged disability. With reference to the nature of the proof required to establish this causal connection, we said in Bernard v. Louisiana Wild Life and Fisheries Commission, La.App., 3 Cir., 152 So.2d 114:
“The established jurisprudence of this State is to the effect that in a compensation case, as in other cases, plaintiff bears the burden of proof, and he is required to establish his claim with reasonable certainty by a preponderance of the evidence. Caldwell v. Caldwell, La.App., 55 So.2d 258; Rowan v. Travelers Ins. Co., La.App., 111 So.2d 387. However, a claimant does not have to prove causal connection to an absolute certainty; it is sufficient that he establish the cause of his in-juris by a reasonable probability. Ellzey v. Fidelity & Casualty Co. of New York, La.App., 123 So.2d 593.”
*786 In the recent case of Guillory v. New Amsterdam Casualty Company, 244 La. 225, 152 So.2d 1, our Supreme Court said:
“Even though this is a compensation suit, plaintiff bears the burden of proof, as in other civil cases, and must establish his claim by a preponderance of the evidence and to a legal certainty. See Bankston v. Aetna Casualty Company et al., La.App., 132 So.2d 111 (1961), and cases cited therein. What is meant by this rule is that plaintiff in a com-, pensation suit is required to make out his case by a preponderance of the evidence and with the same legal certainty as required in any other civil case. It follows from this, that speculation, conjecture, near possibility, and even unsupported probabilities, are not sufficient to support a judgment. Green v. Heard Motor Co., 224 La. 1078, 71 So.2d 849 (1954); Henderson v. New Amsterdam Casualty Company, La.App., 80 So.2d 438 (1955). Though in compensation cases some of our ordinary .rules and procedures are relaxed and liberally construed in favor of the employee, the above rule as to the burden of proof has been held to apply. Moore v. Employers Liability Assurance Corp., La.App., 124 So.2d 804 (1960); Malone, Louisiana Workmen’s Compensation Law and Practice, Sec. 252 (1951 2d ed.).”
Although plaintiff alleged in his petition that he sustained a broken elbow as a result of the 1960 accident, he apparently takes the position on this appeal that the severe trauma which he sustained on July 30, 1960, caused a spur or osteophyte to develop later in his elbow which disabled him. Neither Dr. Smith nor Dr. Swafford, both of whom examined plaintiff shortly after the accident occurred, found any evidence of fractures, and no complaints were made by plaintiff to either of these doctors at that time of an injury to his elbow or arm. Plaintiff testified, however, that he began suffering pain in his elbow about three months after the accident, and his statements' to that effect are supported by the testimony of his wife and of his son. Dr. Lovejoy, although not an orthopedic surgeon, was of the firm opinion that the disabling spur or osteophyte which later developed in plaintiff’s elbow was caused by the 1960 accident, although he concedes that usually this condition is not caused by a single trauma, but by continuous and repeated traumas. Dr. Briel testified that “it is possible that the accident was the cause of it.”
 After considering all of the evidence, we are unable to say that the trial judge erred in concluding that the disability which plaintiff experienced because of the development of a spur or osteophyte in his elbow was attributable to the trauma which he received in the accident of July 30, 1960. We also think the evidence supports his finding that this disability did not manifest itself to a disabling extent until August, 1961. In our opinion, the trial court correctly held that plaintiff was entitled to workmen’s compensation benefits until January 27, 1962, at which time he fully recovered from the injury to his elbow.
We think the trial judge correctly found that there was no causal relationship between the 1960 accident and the headaches, the pain in the shoulder, neck and arm, and the neuralgia which plaintiff now experiences. Dr. Swafford found that the frontal and occipital headaches of which plaintiff complained shortly after the accident were caused by sinusitis, a condition from which plaintiff had been suffering and for which he had been treated for at least three weeks before the accident occurred. The medical evidence establishes, we think, that the shoulder, neck and arm pain, and the neuralgia of which plaintiff now complains resulted from the occlusion of the carotid artery which occurred .about one year after the accident. This occlusion, and the arteriosclerotic condition which apparently caused it, clearly cannot be related in any way to an accidental injury which plain *787 tiff may have sustained during the course of his employment.
Plaintiff contends that as a result of the accident he has suffered an irritation of the occipital nerve. Although Dr. Briel on his first examination felt that there was a cervical disk injury resulting in an irritation of the occipital nerve, he later concluded that his first impression was erroneous and that plaintiff’s complaints were attributable solely to the occlusion of the carotid artery and had no relation to the accident. In our opinion, the evidence fails to show that plaintiff is suffering from an irritation of the occipital nerve, but if he should have such a condition, then we feel that it cannot be attributed to the accident which occurred on July 30, 1960.
Finally, we are convinced, as was the trial judge, that there is no causal connection between the accident and plaintiff’s present anxiety reaction, manifested by depression, or the traumatic neurosis from which he now suffers. Dr. Funk bases plaintiff’s depressed condition largely upon the carotid thrombus, which in turn was caused by the arteriosclerotic condition. He stated that if the arteriosclerotic condition was found to be unrelated to the accident, then in his opinion plaintiff’s present disability could not be related to the work-connected accident. His testimony to that effect is, in part, as follows:
“Q But, again, if the vascular people conclude that there was no causal relation between the accident and the occlusion or the sclerotic condition, then you would agree that this condition you found was not caused by the accident?
“A I think that I would have to say that.”
As we have already pointed out, we think the evidence shows clearly that there was no causal relationship between the accident and the occluded carotid artery or the arteriosclerotic condition which caused, or at least contributed to, the occlusion. Dr. Faulk and Dr. Macpherson also attributed plaintiff’s depressed mental condition to arteriosclerosis and to the occluded carotid artery. In our opinion, therefore, plaintiff has failed to show a causal connection between the accident of July 30, 1960, and his present disabling depressed condition or neurosis. The trial judge correctly held that he was not entitled to compensation benefits after January 27, 1962.
The injury to plaintiff’s elbow did not develop into a disabling condition until about August, 1961. This suit was instituted within one year from the time the injury developed and within two years after the date of the accident. We agree with the'the trial judge that under those circumstances plaintiff’s claim for compensation benefits is not barred by prescription. Defendants’ plea of prescription, therefore, was properly overruled. See LSA-R.S. 23:1209.
Because of plaintiff’s delay of more than one year in notifying defendant of the elbow injury, and the fact that no complaints had been made to any of the doctors who examined plaintiff or to the latter’s fellow employees during that period, we find, as did the trial judge, that defendant was not arbitrary or unreasonable in failing or refusing to pay compensation benefits after August 22, 1961. In our opinion therefore, the trial judge correctly denied plaintiff’s demands for penalties and attorney’s fees.
For the reasons herein assigned, the judgment appealed from is affirmed. One-half the costs of this appeal are assessed to plaintiff-appellant; and the remaining one-half of such costs are assessed to defendants-appellants.
Affirmed.
On Application for Rehearing.
En Banc. Rehearing denied.