124 So.2d 640 (1960)
Enos FONTENOT, Plaintiff-Appellee,
v.
CAMDEN FIRE INSURANCE ASSOCIATION, Defendant-Appellant.
No. 89.
Court of Appeal of Louisiana, Third Circuit.
November 17, 1960.
Rehearing Denied December 14, 1960.
Certiorari Denied February 3, 1961.
*641 Davidson, Meaux, Onebane & Donohoe, by James A. Diaz, Lafayette, defendant-appellant.
Tate & Tate, by Donald Tate, Mamou, plaintiff-appellee.
Before TATE, SAVOY, and CULPEPPER, JJ.
CULPEPPER, Judge.
This is a suit for workmen's compensation benefits in which the plaintiff alleges that he is totally and permanently disabled as the result of a heart attack caused by the work performed in his employment. After trial on the merits, the lower court rendered judgment in favor of the plaintiff and defendant has taken this appeal.
The facts are that the plaintiff, Enos Fontenot, had been employed by his brother, Maxime Fontenot, for approximately 1½ years to supervise the operation of the Mamou Rice Mill, of which Maxime Fontenot was the sole owner. In connection with his employment it was the duty of the plaintiff to supervise five or six employees while they were engaged in the various operations of drying, cleaning, storing and shipping rice. The evidence shows that although these employees did most of the manual labor, the plaintiff did on occasion do things which required considerable physical effort, such as repairing the machinery, lifting sacks of rice and climbing stairs to the second floor to check the operation there. In addition, the plaintiff had acted as shipping clerk since January of 1959 when the regular shipping clerk left Maxime Fontenot's employment.
Plaintiff suffered his heart attack on Saturday, February 7, 1959, and during the week preceding this date, two boxcars of loose rice had been loaded and shipped, but this operation was completed on Thursday, February 5, 1959, and no more rice was shipped that week.
The evidence did not establish the nature of the work which the plaintiff performed on Friday, February 6, or Saturday, February 7, 1959. With regard to his activities on Friday and Saturday, the plaintiff testified, as follows:
"Q. What day of the week did you experience this heart attack? A. On Saturday.
"Q. What were you doing that Saturday, Mr. Enos? A. I really don't know, I was doing the usual work that I used to do, I was running the mill.
"Q. Mr. Enos, I'd like to know from you what you did on that particular day, not what you did general? A. Well I can't tell you because I don't know, I was on the `go' all the time, I was running all the time, and at night I couldn't tell you what I did the same day, because I had too much work.
"Q. Do you remember if you repaired any machinery that day? A. I really don't remember.
"Q. Do you remember if you did any heavy lifting on that day sir? A. I don't remember that neither.

*642 "Q. On Friday afternoon sir, do you remember what you were doing Friday afternoon? A. No sir, I really don't remember.
"Q. Do you remember whether you were doing any heavy lifting on Friday afternoon? A. I really don't.
"Q. Do you remember if you were repairing any machinery? A. I don't remember that sir.
"Q. Were you loading the boxcars for shipment on Friday, sir? A. Well, I thought so, but Art (Arthur Suhm) said it was on Thursday, I don't know.
"Q. Do you know whether you were loading them on Friday? A. No.
"Q. I mean on Saturday, excuse me. A. Saturday I wasn't.
"Q. You were not loading boxcars on Saturday? A. No.
"Q. Sir, was the drier in operation during that week? A. Well, it was, I don't remember, but the drier, we'd just run it at that time, you know, every once in a while, because we don't dry rice in that season, but we got to cool it off, you know, all the rice we have, we just got to pass it through, through the drier and cool it off, but I can't tell you it was running that week.
"Q. Sir, is there usually a man on the second floor of that mill who takes care of the machinery on the second floor? A. That's right.
"Q. Does he also take care of adjusting the huller-blades? A. Yes, he adjust them when he knows how, because he don't know much about it, that's why I have to keep my eye on those hullers all the time.
"Q. That's a part of his duties, sir? A. That is part of his duties, yes.
"Q. And it's part of his duties also to check the machinery? A. That's right.
"Q. Sir, when did you first experience these symptoms of a heart attack? A. I don't get you.
"Q. When did you first start feeling bad? A. Well it was about 9:00 o'clock I guess, in the morning but I didn't thought it was anything, what I mean anything wrong with me, I thought it was just a `gas pain' I had in my chest.
"Q. Had you ever felt these pains before sir? A. No sir."
From the above quoted portion of plaintiff's testimony, we see that he did not establish what particular kind of work he did on Saturday morning before he experienced the first symptoms of this heart attack at approximately 9:00 o'clock a. m. Furthermore, no other witnesses testified as to what kind of work plaintiff did on Saturday morning before his attack. All that plaintiff could say was:
"* * * I was doing the usual work that I used to do, I was running the mill."
Of course, as previously stated, plaintiff supervised the operation of the mill, and although he did on occasion repair machinery, climb stairs, help with sacks of rice, climb in and out of boxcars and engage in other rather strenuous physical activities, there is no evidence in the record that he engaged in any of these physical activities on the morning of his heart attack. No drying or shipping operations were in process Saturday morning and the record is not clear as to whether they were even cleaning rice that morning. However, the mill was open, the bookkeeper, Mr. Arthur Suhm, was there, and at least one employee, Jerry Richard, was working in the warehouse.
The expert medical witnesses, Drs. Stagg, Gremillion and Craig, were all in agreement that the plaintiff sustained a myocardial infarction as a result of a coronary occlusion which occurred on the morning *643 of Saturday, February 7, and which had, as its basis, arteriosclerosis or hardening of the arteries. Dr. R. H. Craig, a specialist in internal medicine, into which specialty heart conditions fall, described myocardial infarct as the death of a portion of the heart muscle. We quote from his testimony, as follows:
"Q. Would you describe, Doctor, what happens when a myocardial infarction occurs? A. The myocardial infarct is actually a death of a portion of the heart muscles. It occurs usually as a result of the blood supply to that particular portion of muscle being cut off. There are instances in which the blood supply is greatly diminished to a particular area of heart muscles and as a result of increased demand, that is, here in relationship to extreme effort this narrowed blood vessel is not able to provide adequate blood and infarction occurs without the vessel being completely obstructed."
with this understanding of the plaintiff's heart attack, we find Dr. Craig clearly expressing the opinion that there is no causal relationship between physical effort and a heart attack which occurs several hours later. Dr. Craig testified, as follows:
"A. If I understand the question, your statement is that he did notthat his strenuous activity or efforts ceased some fourteen hours before his attack, and if that be so, would there be a causal relationship between that effort some fourteen hours previous and the heart attack, is that itdo I understand your question correctly?
"Q. Yes? A. I would say if those were facts that there would not be a relationship between that effort some fourteen hours previously and this heart attack fourteen hours later."
Dr. Craig expressed his opinion as to this particular case, as follows:
"Q. Sir, considering the history, your examination and your diagnosis of Mr. Fontenot's condition, what would be your opinion as to the likelihood of a causal relation between the man's activities and the heart attack. A. From the history I got on the man as to his activity, I thought it was improbable in his particular case that the activities were causally related to his heart attack."
Dr. J. J. Stagg, a general practitioner of Eunice, Louisiana, called as a witness for the plaintiff, testified substantially the same as Dr. Craig, as we see from this portion of Dr. Stagg's direct examination:
"Q. To the same assumption, Doctor, assume that in this three (3) or four (4) day process of mixing and shipping rice, that Mr. Fontenot had to board up the door on the boxcar to put the rice into the boxcar, and had to jump up on this wall or gate or barricade and go over into the boxcar to pick up a sample of rice, then jump out with it and go weigh it, assuming he did this several times in one (1) day or three (3) or four (4) days immediately preceding this accident, and that was the last time he did this was late, approximately 7:00 o'clock on the day immediately before the heart attack; can it be said, Doctor, with reasonable certainty, that this jumping and climbing contributed to and favored the development of the heart attack? A. Not if he didn't do it for a twenty-four (24) hour period before he had his heart attack, I wouldn't, unless he had some pain or something at the time that he was doing it."
Dr. Donald Gremillion, a specialist in internal medicine, called as a witness for the plaintiff, testified that he could not give an opinion as to whether there is a causal relation between physical or mental strain and a coronary attack which occurs several hours later. Dr. Gremillion was *644 clearly of the opinion that in many cases a coronary attack occurs during severe mental strain or heavy physical exertion, but he stated that in many cases people suffer these attacks while they are asleep or at rest, and it is, therefore, very difficult to give an opinion about the matter. As we understand the testimony of Dr. Gremillion, he did not express an opinion one way or the other as to the causal relationship in the instant case.
Turning now to a consideration of the legal principles involved, we find, first of all, the jurisprudence is well settled that the plaintiff in a workmen's compensation case carries the burden of proof as in other civil cases, and is required to establish his claim by a reasonable preponderance of the evidence. Mitchell v. Brogdon, La.App., 106 So.2d 531; Ruffin v. Travelers Insurance Company, La.App., 120 So.2d 532; Anderson v. Peek, La.App., 102 So.2d 776.
In speaking of the proof required in heart attack cases, we find Mr. Wex S. Malone, in his treatise, Louisiana Workmen's Compensation Law and Practice, summarizing the jurisprudence, as follows, on Page 315, Section 256:
"Complications in proving causation arise from the fact that the natural progress of pre-existing heart infirmities can produce disability at any moment regardless of any outside influence. However, it is well settled in medical science that exertion and heat characteristic of heavy physical duties can cause severe injury to a weakened heart or blood vessel. The issue or causal relation is now usually resolved into the sufficiency of alleged exertions and overheating to injure the heart or blood vessel in the specific case. Stoking furnace, carrying ice, operating a drag line, sawing wood, carrying cross ties, cooking glue, and boiler making have all been held to have aggravated the employee's pre-existing weakened condition. On the other hand, where the evidence showed only slight or no exertion or heat, recovery has uniformly been denied."
In the case of Nickelberry v. Ritchie Grocer Co., 196 La. 1011, 200 So. 330, 333, where compensation was denied, we find our Supreme Court setting forth this statement of the law:
"The case therefore presents a situation where the plaintiff admittedly is suffering from a disease of the heart. When the disease began, what was its origin, and the rapidity with which it has progressed, are all matters of pure speculation. The mere fact that a workman develops heart disease while employed by another does not entitle him to compensation. The employer is not the insurer of his employees. There must be an accident to furnish the basis of any such claim, that is to say, something sudden, undesigned or unexpected and that accident must either cause or aggravate the disease which is the cause of the disability."
In Hemphill v. Tremont Lumber Co., 209 La. 885, 25 So.2d 625, 626, our Supreme Court found the workmen's compensation claimant had sustained his burden of proof and held, as follows:
"Since this case does not involve an accident causing external injuries or producing objective symptoms, we must look to the testimony of the medical experts to determine whether this is one of those cases that comes within our well-settled jurisprudence that the legal requirements are present to constitute an accident and an injury is compensable where excessive heat, heavy lifting or other strenuous efforts, although usual and customary, cause or contribute to a physical breakdown or accelerate its occurrence because of a pre-existing condition."
*645 In the instant case there is no proof whatever that, on the morning of his attack, plaintiff was performing strenuous physical labor or working under conditions of excessive heat or under a sudden or intensive mental strain such as would make excessive demands on his heart. There is simply no evidence as to what the plaintiff was doing on that Saturday morning. He might have been simply sitting down or walking around the mill, or watching the employees work.
As the Supreme Court stated in the Hemphill case, supra, we must in each case look to the testimony of the medical experts. In the instant case not one of the three doctors who testified expressed the opinion that there was any causal relationship between plaintiff's work and his heart attack. How could they express such an opinion when there was no proof as to what he was doing for a period of at least fourteen hours before his attack?
The plaintiff endeavored to show that his work was so demanding that he was under a great mental strain all of the time he was at the mill. Dr. Craig, after hearing a description of plaintiff's duties, testified without qualification that he did not think plaintiff worked under any mental strain sufficient to be a causal factor in his heart attack. Dr. Stagg and Dr. Gremillion simply refused to express an opinion in this regard. We, therefore, see that the plaintiff has not one expert medical witness to substantiate his position in this regard.
For the reasons hereinabove set forth, it is, therefore, our opinion that the judgment from which this appeal was taken must be reversed, and it is now ordered, adjudged and decreed that the demands of the plaintiff be rejected. All costs of this appeal, as well as the costs in the lower court, are assessed against the plaintiff.
Reversed.