151 So.2d 587 (1963)
James Ivy SEALS, Plaintiff and Appellant,
v.
POTLATCH FORESTS, INC., Defendant and Appellee.
No. 780.
Court of Appeal of Louisiana, Third Circuit.
March 5, 1963.
Rehearing Denied March 27, 1963.
Dissenting Opinion April 11, 1963.
Certiorari Refused April 30, 1963.
*588 Parker & Parker, by A. B. Parker, Jena, for plaintiff-appellant.
John G. Miller, Jr., New Orleans, for defendant-appellee.
Before FRUGE, HOOD and CULPEPPER, JJ.
CULPEPPER, Judge.
This is a workmen's compensation case. Plaintiff contends he is totally and permanently disabled as a result of a compensable heart attack. After trial on the merits the district judge held that plaintiff had failed to prove an accident arising out of and in the course of his employment. Plaintiff appeals.
The substantial issues are whether plaintiff suffered a compensable accident and, if so, is there any causal connection between the accident and his present disability.
The facts show that plaintiff had been employed by the defendant for many years as a lumber inspector. His duties were to travel about to the various lumber companies, from whom his employer had purchased lumber for the manufacture of flooring and furniture, to ascertain, when the lumber was loaded for shipment, that it was of the proper grade. Normally the work was not strenuous, requiring only that he measure and inspect the boards and keep a tally sheet as an employee of the lumber yard turned the boards over for this purpose.
In about 1956 plaintiff began to have pains in his chest on exertion. In 1957 he went to Oschner's Clinic in New Orleans, where his condition was diagnosed as arteriosclerotic cardiovascular disease with angina. (A condition in which the blood vessels supplying the heart muscles have become partially closed by a fatty substance progressively building up over the years inside the vessels. The angina, or chest pain, is caused by a spasm of these partially occluded vessels when the heart muscles, due to exertion, require greater amounts of blood.) Oschner's Clinic prescribed nitroglycerine tablets (which dilate momentarily the blood vessels) to be taken during attacks of angina. The doctors at the clinic did not recommend that plaintiff stop working as a lumber inspector.
Plaintiff continued to work until Tuesday, August 12, 1959. On that hot summer day at about 9 o'clock a. m. he was in Krotz Springs, Louisiana, inspecting lumber. Mr. Barrilleaux, an employee of the lumber *589 yard, was turning the boards over for plaintiff's inspection. Mr. Barrilleaux left for a few minutes to wait on another customer and while he was gone plaintiff turned over 25 or 30 of these boards, each weighing anywhere from 10 to about 60 pounds. Plaintiff testified he then experienced a severe pain in his chest and sat down. He took one of his nitroglycerine pills and after a few minutes went to the office of the lumber company where he remained for about an hour and a half. He then decided he would drive back to his home in Jena, Louisiana. On his way home he took two more nitroglycerine pills and, on arriving in Jena, went to bed. The next day, Wednesday, August 13, 1959, he telephoned his physician, Dr. M. B. Pearce in Alexandria, Louisiana, and it was decided that plaintiff would enter the hospital in Alexandria on Sunday, August 17, 1959 for tests, examinations and any treatment necessary. Plaintiff was in the hospital about ten days during which time he suffered another attack of angina. On his release, he went home and stayed in bed another two weeks. When he asked if he could return to work he was advised not to try for at least six months. However, Dr. Pearce, as well as Dr. Rufus Craig, a heart specialist who was called in consultation, testified that plaintiff was totally and permanently disabled from working as a lumber inspector.
The purpose of the bed rest in the hospital and at home was to allow "collateral circulation", that is, other heart vessels taking over part of the function of the arteriosclerotic vessels. Dr. Pearce and Dr. Craig also prescribed anti-coagulants, which plaintiff was still taking at the time of the trial of this case. The purpose of these anti-coagulants was to thin the blood to prevent the formation of clots which might occlude one of the thickened vessels. At the time of trial Dr. Craig thought the progress of the disease had at least been retarded.
Both Dr. Pearce and Dr. Craig testified positively that the several electrocardiograms examined by them showed no infarct (dead tissue) or other damage to the heart muscles or vessels.
The first issue is whether plaintiff suffered an accident under our workmen's compensation law. LSA-R.S. 23:1021(1) defines an accident as "an unexpected or unforeseen event happening suddenly or violently, with or without human fault and producing at the time objective symptoms of an injury." In the recent case of Prejean v. Bituminous Casualty Co., La.App., 125 So.2d 221, this court called attention to the following language from the often cited heart attack case of Nickelberry v. Ritchie Grocer Co., 196 La. 1011, 200 So. 330 (La.Sup.Ct.1941):
"The case therefore presents a situation where the plaintiff admittedly is suffering from a disease of the heart. When the disease began, what was its origin, and the rapidity with which it has progressed, are all matters of pure speculation. There mere fact that a workman develops heart disease while employed by another does not entitle him to compensation. The employer is not the insurer of his employees. There must be an accident to furnish the basis of any such claim, that is to say, something sudden, undesigned or unexpected and that accident must either cause or aggravate the disease which is the cause of the disability."
Later cases, particularly Hemphill v. Tremont Lumber Co., 209 La. 885, 25 So.2d 625 (La.Sup.Ct.1946) make it clear that the requirements of a compensable accident are met where excessive heat or strenuous effort cause, contribute to or accelerate the occurrence of a heart attack, even though the excessive heat or strenuous effort were nothing more than the usual and customary conditions encountered by the claimant in the course of his employment. See also McKnight v. Clemons, La.App., 114 So.2d 114 (1st Cir., App.1959) and the many cases cited therein.
*590 Under this jurisprudence we think it is clear that Mr. Seals suffered a compensable accident on August 12, 1959. The evidence shows that on this hot summer day Mr. Seals, who was suffering from progressive arteriosclerotic cardiovascular disease had "flipped" 25 or 30 boards when he had a very painful attack of angina. The expert medical witnesses testified that such activity probably caused the attack, that is, the exertion resulted in a spasm of the narrowed vessels, when the overworked heart required an additional blood supply. The attack was sudden and unexpected and was caused by heat and exertion which were a part of Mr. Seals' employment. Clearly there was an accident.
The case of Prejean v. Bituminous Casualty Corp., 125 So.2d 221 (3rd Cir., App.1960) cited by defendant is distinguishable in that there a police patrolman suffered a heart attack while riding in a car and there was no preceding physical or mental strain. Likewise, Fontenot v. Camden Fire Ins. Ass'n, La.App., 124 So.2d 640 (3rd Cir., App.1960) is distinguishable because in that case there was no proof of any preceding activity sufficient to cause a rice mill foreman's coronary occlusion.
The plaintiff is unquestionably permanently and totally disabled. The next issue is whether this permanent disability was caused by the normal progressive nature of the disease, that is, the continued build up of fatty substance inside the vessels, or was it caused, contributed to or accelerated by the specific attack of angina on August 12, 1959. See Malone's Louisiana Workmen's Compensation Sections 254 through 256 for the citation of many cases holding the fundamental proposition that the accident must have a causal connection with the disability.
Although plaintiff actually continued to work up until August 12, 1959, and, on the advice of his physicians, has not worked since, there is not one shred of expert medical testimony in the record to show that after this attack of angina and the period of recuperation therefrom, plaintiff's condition was in any way worsened by the episode of chest pain in question. Only two physicians testified in this regard. Dr. Rufus Craig, a specialist in internal medicine, summarized his opinion as follows:
"Q And he isevery attack is he not a little more susceptible or easier for him to have another attack by virtue of having had one
"A Not necessarily
"Q In other words if you have the flu you are easier to have it again?
"A No sir.
"Q Not necessarily?
"A No sir. In other words with each attack it is a self limited thing once he is over it with this particular emity there is no damage done to the heart.
"Q What about the vessels?
"A No sir."
Dr. Craig made it clear in other parts of his testimony that if an attack of angina is caused by an occlusion of the vessel, resulting in an infarct, there would be permanent damage to the heart muscle. But, in this case Dr. Craig found no infarct and was of the opinion that the arteriosclerosis was not in any way caused, contributed to or accelerated by this episode of angina.
Dr. Pearce, plaintiff's treating physician, testified to the same effect as follows:
"Q Having had some attacks of that kind that may be mild everytime you have one doesn't that weaken the vascular system to where you are more in danger of having another one?
"A Not necessarily.
"Q When you have these kind of Angina Attacks aren't you more *591 in danger of having a coronary occlusion?
"A Not necessarily no sir."
Nowhere in their testimony did either Dr. Craig or Dr. Pearce, or any other doctor, express the opinion that as a result of having had this particular attack of angina, plaintiff had any heart damage or was any more likely to have another attack. This attack gave the doctors the knowledge that plaintiff's disease had progressed to the point where he should no longer work as a lumber inspector, but his condition was in no way worsened by the attack.
We find no causal connection between the accident and plaintiff's permanent disability. But, it is our opinion that plaintiff is entitled to compensation for the period of disability attributable to this particular episode of angina on August 12, 1959. The question of the duration of this causally connected temporary disability is not without difficulty because the chest pain did not last very long and there were, as the doctors later determined, no residual effects of the accident. However, we think plaintiff is entitled to benefits for the period of medical examinations and bed rest prescribed by the doctors as a result of this particular attack. This period lasted through September 18, 1959. Otherwise, his disability is not shown to have been caused by the accident, but by the normal progressive nature of the disease.
This case is similar to Andrepont v. Calcasieu Paper Co., La.App., 131 So.2d 585 (3rd Cir., App.1961) where a paper mill laborer, who had suffered for some time with hypertension and high blood pressure, suffered an attack of greatly elevated blood pressure and resulting heart pain, while doing strenuous work in a hot room. This court held plaintiff's temporary disability for six months was causally connected with the accident but that there were no residual effects and hence no causally connected permanent disability.
For the reasons assigned, the judgment appealed is reversed and set aside. It is now ordered, adjudged and decreed that there be judgment herein in favor of the plaintiff, James Ivy Seals, and against the defendant, Potlatch Forests, Inc., for compensation payments in the sum of $35 per week for the period, August 12, 1959, through September 18, 1959, together with legal interest on each unpaid installment from its due date until paid. It is further ordered, adjudged and decreed that defendant pay to plaintiff the medical expense incurred during this period, including the Baptist Hospital bill of $464.04 and the bills of Dr. Pearce and Dr. Craig in the sum of $125. It is further ordered, adjudged and decreed that defendant pay all costs of these proceedings, including the expert witness fee of Dr. Pearce in the sum of $65 and the bill of Mrs. Virgie Middleton in the sum of $67.50 for taking depositions. All costs of this appeal are assessed against the defendant.
Reversed and rendered.

On Application for Rehearing.
En Banc. Rehearing denied.
TATE, Judge (dissenting).
I respectfully dissent from the refusal to grant a rehearing.
We have here a claimant who had performed the duties of his employment without difficulty for at least twelve years. Prior to the present compensable accident, it is true, he was afflicted with a latent heart condition, but this condition caused him little difficulty and was not at all disabling. We have further found that on August 12, 1959, he suffered a heart attack as a result of an accident at work.
Finally, the medical evidence in this record in uncontradicted that always after this heart attack (always and continuously) the claimant has been unable to perform the slightest exertion without the immediate recurrence of disabling heart pain. In fact, *592 the majority opinion even concedes that the evidence proves the plaintiff to have been totally and permanently disabled at all times following the accident of August 12, 1959, as medically verified by clinical tests which showed that exertion immediately brought on heart pain. See, e. g., Tr. 60.
All of these facts are conceded by the majority. The claimant has been denied recovery, however, because the expert medical witnesses were unable, in the present state of medical science, to say that the heart attack at work had produced physical changes which converted the previously non-disabling heart condition into a present disability. But this expert medical evidence must be construed in the light of the admissions by these same medical experts that medical science does not yet know the cause of the arterio-sclerotic cardiovascular disease with which the plaintiff is afflicted, or of its progress from a non-disabling into a disabling condition. Of this, more later.
The majority would thus deny the plaintiff recovery because in the present state of medical science the most learned scientist in the world cannot definitely say (nor can he deny) that the incident at work did precipitate the latent heart condition into present disability. The majority holds to this result even though the uncontradicted testimony shows that the claimant had always performed the duties of his employment without disabling symptoms prior to the heart attack at work of August 12th, while (as noted) at the same time the uncontradicted medical evidence shows that, always after this heart attack, any attempt at exertion by the plaintiff produces disabling heart pains.
In so holding, I think the majority has completely overlooked pertinent principles uniformly applied by the Louisiana courts in instances such as this, where medical science may be unable to ascribe any precise causal connection between the accident and the subsequent disability, but the circumstances of prior latency and subsequent precipitation into disability strongly indicate that the accident at work must have been a precipitating event of the residual disability.
Since early in our compensation law it has been a settled principle that where an accident at work results in a proven disability, which is continuous following the accident, the law presumes that the accident caused or precipitated the continuous disability following it, where the workman was in good health or afflicted only with dormant symptoms of the disease prior to the accident. Blanchard v. Travelers Insurance Co., La.App. 1 Cir., 121 So.2d 515, and many cases cited therein.
Thus, in the Blanchard case, the claimant suffered a blow on the head. Prior to the accident, he had suffered from no disability symptoms. Always thereafter, he had high blood pressure and spells of dizziness and headaches. However, the expert medical testimony could ascribe no causal connection whatsoever between the continuous disability following the accident, at least in the present stage of medical science. Nevertheless, workmen's compensation was allowed for the employee's continuous disability following the accident, because of the legal presumption of causal connection under such circumstances so similar to the present.
Again, the present situation is somewhat similar to compensation suits based on the claim that a trauma aggravated a latent cancerous disease into active disability or death. Medical science even to this minute does not know the cause of cancer and whether (or not) a trauma can precipitate a latent malignancy into disabiling symptoms. Be that as it may, the courts have almost invariably allowed recovery where the claimant was in fact able to work without disability prior to the accident at work, although his disability has thereafter continuously manifested itself. See: Pixley v. Employers' Mut. Liability Ins. Co., La.App. 2 Cir., 102 So.2d 113; Taylor v. Mansfield Hardwood Lbr. Co., La.App. 2 Cir., 65 So.2d 360; Vautrot v. Maryland Cas. Co., *593 La.App. 1 Cir., 32 So.2d 500 (non-malignant tumor); Custer v. Higgins Industries, La.App.Orl., 24 So.2d 511; Causey v. Kansas City Bridge Co., La.App. 1 Cir., 191 So. 730; Broussard v. Union Sulphur Co., 5 La.App. 340.
Returning to the facts of the present case, it is absolutely uncontradicted that always following the accident of August 12th, the plaintiff has been medically found to be suffering from a "Class III" stage of his arterio-sclerotic heart disease, which means that it has progressed to a disabling state, by reason of which the plaintiff is limited only to moderate activities.
On the other hand, the uncontradicted testimony further shows that always before the accident of August 12th, the plaintiff was able to perform his duties without producing disabling symptoms. In 1957, his latent heart condition had been first diagnosed at Ochsner's Clinic as not disabling. Also, the claimant's personal physician had seen him just four months before the accident (Tr. 59) for another condition, without any serious complaint of the patient having any trouble with his previously diagnosed heart condition, although the physician knew that the claimant had previously complained of mild non-disabling pains after eating which had been easily relieved by nitroglycerin pills. This doctor frankly admitted that he would not have advised the claimant to quit working prior to August of 1959 (Tr. 80)although it was his definite opinion that, following the accident in August of 1959, the plaintiff must cease working to avoid any further acceleration of his disease.
The majority apparently concedes that between the time the claimant had last gone to Ochsner's Clinic in 1957 and had been cleared as able to perform his duties, and August 12, 1959, the claimant's disease had progressed from a non-disabling "Class I" or "Class II" stage into a disabling "Class III" stage. I suggest that the claimant's doctor's testimony of his casual examination in April of 1959 strongly indicates that this dramatic change in the plaintiff's condition occurred at some time between it and this physician's next examination of the claimant following the accident, only four months later. (To illustrate the difference, the "Class III" stage, according to the medical expert, "means probably that if he walks a block or more, particularly if he is up a little hill or if he exert himself he will bring on an attack of pain * * *". Tr. 64.)
It is true, as the majority notes, that this physician stated that the attack at work did "not necessarily" produce any permanent weakening of the vascular system nor increase the hazard of having further attacks. However, as I read his testimony, he also stated that the heart condition "became aggravated in August of 1959" (Tr. 70), and that medical specialists "stopped them [heart patients when their disease progresses to a certain state] from working because [when] a man continues to have pain it is more likely to cause a condition to grow progressively worse more rapidly than if he is not having attacks." (Tr. 73).
Thus, this doctor further testified:
"Q. So that after suffering with a bout of pain and then after he has recovered, that he has reliefhis arteries so to speak and his heart is in no worse condition than it was previous to theprevious to having this bout of pain?
"A. That might be true for one bout but if he continues to have those why we do think that his condition grows progressively worse. In other words it is aggravated by something whether it is aggravated by stress or whether it is aggravated by eating too much or overweight or overwork or what notit is a progressive condition. That is the reason we have to stop these people from working because there is an aggravation of the condition if they continue *594 to work. The disease gradually gets worse.
"Q. How would that do it doctor, medically speaking? How would you aggravateoutside of pain now I realize you could have Angina with arteriosclerosishow would you aggravate the arteriosclerosis itself the underlying disease that we have here?
"A. Nobody knows so far as I know, in my opinion, nobody knows exactly what causes an individual to have arteriosclerosis in the first place. We know that certain individuals have it and others don't and we know it is due to deposition of these deposits in the vessels that produce a thickening of the vessel or finally maybe a coronary occlusion. We know that stress and strain aggravate these condition. We know that manual labor aggravates these conditions. We know that getting angry andaggravates and I even think smoking aggravates it and I believe tobacco has a great influence on coronary disease because I've seen it associated too much in the past thirty years. We don't none of us know exactly what causes it to happen. It does happen and it does progress and we think it progresses more in those individuals who have stress or strain or do an excessive amount of work that they are physically not capable of doing. When they overload themselves to speak or even with eating."
In summary, then, this expert testimony, to me, indicates that, while a single attack might "not necessarily" aggravate the prior heart condition, yet, fairly construed, it also indicates that at a certain stage, after each attack, the condition may grow "progressively Worse". (It is for this reason that doctors therefore recommend that "Class III" patients cease working to avoid this acceleration of the disease caused by continuous attacks because of exertion.)
If each attack of a "Class III" patient may accelerate the progress of the disease, it is apparent to me that the most probable explanation of the plaintiff's continuous disability since his heart attack at work on August 12th, is that this very severe attack (by far the most serious the claimant had ever experienced before), was the precipitating event which accelerated the progress of his previously latent heart disease into his present active disability.
Upon analysis, it appears to me that the majority fell into error upon its determination that there "is not one shred of expert medical testimony in the record to show that after this attack of angina and the period of recuperation therefrom, plaintiff's condition was in any way worsened by the episode of chest pain in question."
What this overlooks, of course, is that between the plaintiff's examination at Ochsner's in 1957 (when a mild and non-disabling angina condition was diagnosed) and the accident in August of 1959, the plaintiff did not obtain any further expert medical opinion as to the progress of his disease because in fact, as the uncontradicted lay testimony shows, it did not cause him any disabling symptoms or serious concern.
I do not think that it is necessary in order for the plaintiff to recover for him to obtain "expert medical testimony" positively proving that as of August 11th (the day before the attack at work) his condition was non-disablingthe uncontradicted lay testimony (corroborated by what casual medical observations were made of him during the interval) positively shows that prior to the accident of August 12th his condition did not manifest itself through disabling symptoms upon exertion, as it has at all times following the very severe heart attack at work on August 12th.
What I think my conscientious brethren of the majority have done, unintentionally, *595 is to require the claimant to prove beyond a reasonable doubt that his heart condition was aggravated into disability by the heart attack at work, whereas in compensation as in other civil cases a claimant need only prove his disability by a preponderance of the evidence, Webber v. Wofford-Brindley Lbr. Co., La.App. 1 Cir., 113 So.2d 23, certiorari denied.
Our holding in Andrepont v. Calcasieu Paper Co., La.App., 131 So.2d 585, can be distinguished under its different facts from that applicable to the present situation. There, a majority of this court (with the present writer as author of the opinion), held that there was no manifest error in the trial court's finding that the disability of the claimant at the time of trial was in no way greater than that which existed immediately prior to the accident at work. Compensation was therefore allowed only for temporary disability.
In the Andrepont case, however, unlike the present, there was in the view of the majority strong medical testimony that the claimant had a certain disability prior to the accident at work, which disability was not in fact less than that which the claimant was afflicted following the accident and at the time of the trial. Here, on the other hand, the only evidence pertaining to the question shows that the claimant had only non-disabling symptoms of his arterios-clerotic disease prior to the accident at work, whereas always afterwards there was a markedly greater degree of disability, so much so that the claimant immediately suffers disabling heart pains upon the slightest exertion, even walking a couple of blocks.
For the foregoing reasons, conceding that the majority opinion has very fairly set forth the facts, I must nevertheless respectfully dissent from the refusal of my esteemed brethren of the majority to grant a rehearing, because I think that the majority opinion has inadvertently but incorrectly misapplied the pertinent legal principles to these facts.