182 So.2d 805 (1966)
Aver V. PRATER, Plaintiff and Appellant,
v.
LIBERTY MUTUAL INSURANCE COMPANY et al., Defendant and Appellee.
No. 1638.
Court of Appeal of Louisiana, Third Circuit.
February 15, 1966.
Piccione, Piccione & Wooten, by Charles N. Wooten, Lafayette, for plaintiff-appellant.
Hall, Raggio & Farrar, by Richard Cappel, Lake Charles, for defendant-appellee.
Before SAVOY, HOOD and CULPEPPER, JJ.
CULPEPPER, Judge.
Plaintiff seeks workmen's compensation benefits for the death of her husband, Leo *806 Prater, whose death from a heart attack is alleged to be causally connected with his employment. From a judgment rejecting her demands, plaintiff appeals.
The facts show that Leo Prater, 63 years of age, had worked for Firestone Synthetic & Latex Company for over 20 years. At the time of his death he was working in the receiving department, where his duties were to assist in unloading raw materials that arrived by railroad car or truck; storing these materials in a warehouse; and then, on request, delivering them to various departments for use in the manufacturing process. Approximately 98% of these materials which he handled were received at the plant and delivered to the departments on pallets. To move these pallets Prater used an electric hand jack which was self-propelled and would go forward or back by turning a knob. The jack would slip under the pallets and raise or lower them by pushing a button. Prater walked behind the jack and guided it. Occasionally, unpalletized materials were received. With the assistance of a co-employee, Prater placed these items on a pallet. Also, occasionally, materials fell from one of the pallets and Prater replaced them. All of Leo Prater's co-employees testified that his work was the lightest at the plant and that it did not involve heavy manual labor; except one Anthony Bartie, who stated that he classified anything, other than sitting down, as hard manual labor.
Medical records of its employees kept by the Firestone plant showed that Prater had suffered from heart disease for over 20 years. He had an aortic valvular leak, of syphilitic origin, an enlarged heart, high blood pressure, arteriosclerosis and episodes of angina. Following periodic examinations, the company doctor recommended that Prater perform only light work and, as noted above, he was retained in that type of job.
His family physician was Dr. Charles W. Ross, who testified that he saw Prater 2 or 3 times a year for his heart condition and was treating him with various drugs. On Saturday, January 11, 1964, which was two days prior to Prater's death, he went to see Dr. Ross complaining of chest pain. Dr. Ross found the blood pressure to be at about 230/130 and prescribed drugs, advising Prater to "take it easy". But he did not advise Prater to stop working.
On Monday morning, January 13, 1964, Prater went to work at 6:00 a. m., as usual, and performed his usual duties. At about 10:00 a. m., while going up the freight elevator with Anthony Bartie, Anthony complained to Prater about having a chest cold and Prater then said that his arm, neck and chest were hurting. This is the only evidence of any complaint by Prater during the day while at work. Other co-employees testified that Prater appeared normal to them and that he made no complaint and performed his usual duties. After work that day, Prater rode home with his brother-in-law, Rev. Joseph E. LeDoux, who also testified that Prater appeared normal and made no complaint.
Prater's wife, the plaintiff in these proceedings, testified that when Prater reached his home about 3:45 p. m., his face and eyes were bloated and he was groaning and complaining of intense pain in his chest and arm. He laid down on a sofa and said he would wait for the pain to pass. Plaintiff testified her husband told her that his arm and chest had started hurting about 10:00 a. m. that morning and he thought the pain would pass so he kept on working, but the pain continued. Then, apparently, plaintiff became alarmed about the seriousness of her husband's condition and phoned Dr. Ross. After hearing a description of Prater's condition, Dr. Ross ordered that Prater be moved to the hospital by ambulance. But, Prater was pronounced dead on arrival at the hospital a little after 4:00 p. m.
Although Dr. Ross did not see Prater, either immediately before or after his death, he stated on the death certificate that the cause of death was "acute myocardial infarction." Dr. Ross explained *807 that from his personal knowledge of plaintiff's heart disease and the description of his symptoms immediately preceding death, he was of the opinion that one of the coronary arteries, which had become narrowed by arteriosclerosis, had become occluded by a blood clot, resulting in infarction, i. e., the death of a part of the heart muscle.
Plaintiff does not contend there is any causal connection between Prater's employment and the heart disease with which he had suffered for years. Nor is she able to show any work-connected activity which caused the alleged initial onset of pain at about 10:00 a. m. on Monday, January 13, 1964. Her substantial contention is that the work he performed, after this initial episode of pain, has a causal connection with his death at about 4:15 p. m. that afternoon. In other words, plaintiff contends that Prater's continuing to work, instead of going to bed as all of the medical experts testified they would have advised had they known Prater's condition, aggravated, accelerated, and contributed to Prater's death.
Our jurisprudence is now established that, in cases of this type, plaintiff bears the burden of proving by a preponderance of the evidence, as in any other civil case, that there is a causal connection between the employment activity and death or disability resulting from a heart condition. Nickelberry v. Ritchie Grocer Co., 196 La. 1011, 200 So. 330; Fontenot v. Camden Fire Insurance Association, 124 So. 2d 640 (La.App. 3rd Cir. 1960); Seals v. Potlatch Forest, Inc., 151 So.2d 587 (La. App. 3rd Cir. 1963). In the recent case of Guillory v. New Amsterdam Casualty Company, 244 La. 225, 152 So.2d 1 (1963), our Supreme Court, in discussing what is meant by preponderance of the evidence in compensation cases, states that "speculation, conjecture, near possibility, and even unsupported probabilities, are not sufficient * * *." In Bernard v. Louisiana Wildlife & Fisheries Commission, 152 So.2d 114 (La.App. 3rd Cir. 1963) this court said such proof must be by a "reasonable probability", and that mere possibility is not sufficient. See also the very recent case of Adams v. Home Indemnity Co., 180 So.2d 51 (La.App. 3rd Cir. 1965; writ denied La., 181 So.2d 398) for a full discussion of claimant's burden to prove causal connexity in this type of case.
The jurisprudence is likewise established that where physical effort, although nothing more than usual and customary in the employment, causes, contributes to or accelerates death or disability from a heart attack, the requirements of a compensable accident are met. Hemphill v. Tremont Lumber Co., 209 La. 885, 25 So.2d 625 (1946); Seals v. Potlatch Forest, Inc., supra; Roberson v. Michigan Mutual Liability Co., 90 So.2d 465 (La.App. 2nd Cir. 1956); Franklin v. Old Colony Insurance Co., 150 So.2d 892 (La.App. 4th Cir. 1963).
As we noted in most of the cases cited above, we must, in each case, look principally to the testimony of the medical experts to determine whether there was causal connexity between the employment activity and death or disability resulting from a heart attack. Four doctors testified in this case and, basically, there is little conflict in their opinions. All agreed that death probably resulted from myocardial infarction due to coronary thrombosis, i. e., a blood clot occluding a narrowed arteriosclerotic vessel in the heart. These doctors all testified that if they had seen Prater that Monday morning, complaining of pain in his chest and arm, they would have prescribed bed rest until the episode subsided. But, not one of the medical experts would express an opinion one way or the other as to whether Prater's continuing to work at his usual nonstrenuous duties contributed to or accelerated his death. For instance, Dr. Ross, a general practitioner, said:
"Q So what you are saying is whether he didn't work or not, you can't say whether it would have had *808 any difference on his death that afternoon.
"A That's right, I can't."
Dr. Harold Lovejoy, a specialist in internal medicine, testified:
"Q So you really cannot state with any certaintyalthough I realize you would advise against it, you cannot state with any certainty whether the continued work that he was doing after he complained of the pain in his arm contributed or not to his ultimate attack that evening, from which he expired.
"A No, I don't know what would have happened. I can't answer those questions.
"Q No way in the world to tell one way or the other, is there, Doctor?
"A No, sir."
Dr. Sam Nadler, a highly qualified heart specialist, said:
"A Academically speaking, I don't think it makes any difference, because I am not impressed with the amount and kind of work that he did as playing a role in cardiac heart disease, really. I don't think so. And the fact that he had a good work record before this, and the fact that he was able to work up to this time, which was very fortuitous with what he did have, would seem to point away from the situation of coronary arteriosclerosis, which he obviously had, and work precipitating a so-called heart attack, and points very definitely in the direction of an arteriosclerotic plaque rupturing with a clot formation in the form of a coronary thrombosis."
Dr. David Buttross, Jr., also a heart specialist, testified:
"Q Doctor, let me ask you this. Suppose that Leo had reported his condition and had been sent to see his doctor and his doctor ordered bed rest. In other words, suppose that when he started having these pains Monday, he actually stopped working and went to bed. Is there any assurance that he would not have died just as he died Monday afternoon when he got home from work?
"A None whatsoever.
"Q It's just obvious that in medical circles, if a man is complaining of these symptoms, you are going to put him to bed.
"A Correct.
"Q That's good medical practice.
"A Correct.
"Q But that is the natural precaution to take. To say that he would have lived any longer would have been pure conjecture on your part, would it not?
"A That is correct."
We agree with the conclusion reached by the trial judge in his detailed and well considered written opinion as follows:
"The decisions in a number of the cited cases emphasize the fact that an employer is not an insurer of his employee and, to allow compensation for Prater's death under the facts and circumstances of this case would, in this Court's opinion, permit recovery for any disability or death if the employee manifested any symptom of a disease while at work. Such result would constitute the employer as an insurer of the employee with respect to any occurrence at work, regardless of an accident or the cause of the alleged disability or death complained of. The Court concludes that *809 the plaintiff in this case has not established her claim in legal certainty, by a preponderance of the evidence, as she is required to do."
For the reasons assigned, the judgment appealed is affirmed. All costs of this appeal are assessed against the plaintiff appellant.
Affirmed.