GARRISON, Judge,
dissenting.
As the majority so aptly stated, it is not our appellate function to substitute our evaluation of the evidence for that of the trial judge, unless the record establishes that his factual conclusions are manifestly erroneous — but if ever a case of manifest error has existed, it appears to me that this is the case. Prior to an examination of manifest error, however, I am compelled to dissent from the statements of law contained within the majority opinion.
*462 The majority’s statement relative to a breach of a delegated personal duty fails to take into account this court’s recent ruling in Bazley v. Tortorich, 380 So.2d 727 (La.App. 4th, 1980). Bazley involved an interpretation of executive officer immunity from non-intentional acts, as set forth by Act 147 of 1976. While the instant appeal arose prior to the effective date of Act 147, the court here incongruously is applying a stricter standard for liability than was applied in Bazley, with clearly inequitable results.
In Bazley, this court stated:
“. . any action of an executive officer, . . ., which, if committed by a third party, would cause that third person to be liable in damages to an injured employee, then such action will also render liable such executive officer, . . ” At 733.
In Bazley, the court also found that the following constituted intentional acts:
“Operating an unsafe and hazardous garbage truck;
Continuing the operation of the aforesaid garbage truck when it was acknowledged that it was unsafe and hazardous;
Operating the said garbage truck in the absence of a working horn;
Conscious disregard of safe and reasonable mechanical and electrical maintenance standards;
Failure to keep a proper lookout;
Failure to see what should have been seen;
Failure to avoid the collision;
Stopping the garbage truck in a dangerous position;
Failing to stop the garbage truck on the shoulder of the road; and
Failing to warn the plaintiff of an oncoming danger.”
In the present case, Morgan Chrisham alleged that his accident was caused by the following omissions and/or acts of Donald Blume,[1] H. W. Arvin, P. E. Lewis, and Roy Dunn:
“1. In having actual and constructive knowledge of the unsafe place on which plaintiff was required to work without taking the necessary steps and formulating the necessary company policies that would have removed the dangerous conditions on the scaffold.
2. In failing to provide a guard railing around the scaffold or to secure the floor to the frame and in failing to provide adequate assistance to handle the heavy beams.
3. In failing to exercise the authority embodied in his position to have remedied the existing dangerous condition.
4. In having knowledge and failing to warn plaintiff that the work he was performing was apparently dangerous.
5. In failing to provide plaintiff with a safe place to work.
6. In failing to provide plaintiff with adequate help to handle heavy materials.
7. In failing to properly, adequately, timely, and with reasonable frequency conduct safety meetings and inspect and have inspected the scaffold and area in which plaintiff worked.
8. Any and all other acts of malfeasance, misfeasance or nonfeasance as may be discovered which acts are but known to the defendants.
Morgan Chrisham further alleged the following acts and/or omissions on the part of the Board of Directors of Borton, Inc.:
“a. Failed to have the work supervised.
b. Failed .to require any officer and/or official of Borton, Inc., to conduct safety meetings so that employees could be informed and/or be made aware of the dangerous nature of their work.
c. Failed to promulgate and/or enforce proper safety standards which would have prevented the accident.
d. In failing to hire and/or train and/or educate any officer and/or official in Borton, Inc. to acquire the necessary expertise necessary to have set up the proper safety standards that would have prevented the fall.”
*463 If the Bazley standard for an intentional act were applied to the acts alleged in the Chrisham case, then clearly those acts would give rise to executive officer liability. Our law is based upon the premise that negligence is “something less” than an intentional act. Clearly then, this court should use a less strict standard for the imposition of liability based on negligence, than is used for the imposition of liability grounded in intent.
I do not in any manner criticize the panel for its holding and opinion in Bazley, which in my regard is a most progressive and important clarification of the quagmire of workmen’s compensation law. Rather, I commend my brethren on the Bazley panel and only regret that the majority here has allowed to be imposed, with devastating consequences to the plaintiff, so much narrower a test for determining negligence at the executive level.
In the absence of such an application, however, it is necessary to examine the state and purpose of the workmen’s compensation law prior to the enactment of Act 147 of 1976.
As the eminent Wex Malone stated in Workers’ Compensation, Louisiana Civil Law Treatise, West Publishing Co., 1980: [2]
“Insofar as the employer’s general duty to his employee is concerned, there is no appreciable difference between the common law and the civilian approach. Under either view the employer owes the employee the broad obligation of being free from fault and negligence. In the French Civil Code this duty is included under the general principles of Articles 1382 and 1383. Likewise at common law the servant who is engaged in work at a place controlled by the master is entitled to the protection accorded invitees or business visitors, which means that care must be exercised to furnish the laborer with a ‘reasonably safe place to work.’ The ‘place to work’ includes not only the physical premises where he operates but likewise the machinery and tools with which' the work is done, including the provision of safety appliances. The duty to make the place safe embraces not only the provision of suitable physical facilities, but also requires the employer to formulate a safe system of operation, to provide sufficient employees to do the work safely and to arrange properly the workers who are assigned to the job.
Jfc * Jj{ í(í }{C if;
“These same obligations can be, and frequently are, found by implication in the usual contract of employment. Similarly, there is read into that contract an undertaking by the employer to instruct the employee as to the conduct of his duties, to warn him of dangers of which the youthful or inexperienced worker may not be aware, and not to assign him tasks which are beyond his competence to perform with reasonable safety.
“The existence of this general duty of care, then, has been confirmed consistently under both systems of law and has been recognized repeatedly in Louisiana jurisprudence. The duty to supply a reasonably safe place to work, the duty to instruct and to have regard for the safety of the employee in making rules and institute a system of work, as well as the duty to employ sufficient persons to discharge the work with reasonable safety have been imposed by the courts of this state without any serious attempt to depend upon one system of law or the other. Not infrequently the employer is also subjected to liability because he has violated some penal statute enacted for the protection of his employees.” Pages 4-7 (emphasis added)
Thus it is readily apparent that the standards used by this Court in Bazley are the same as the standards used prior to the enactment of Act 147, something less than a milestone of progressive legislation. Among Bazley’s other features, to a considerable degree, it was a reversion to the *464 pre-Act 147 status quo. The majority here,, on the other hand, runs headlong into the eminently reasonable position taken by Bazley with its rigid adoption of the “personal duty” in the narrowest possible context.
In any case, I find that a violation of the statutory duty to provide a safe place to work has occurred. R.S. 23:13 mandates the following:
“Every employer shall furnish employment which shall be reasonable safe for the employees therein. They shall furnish and use safety devices and safeguards, shall adopt and use methods and processes reasonably adequate to render such employment and the place of employment safe in accordance with the accepted and approved practice in such or similar industry or places of employment considering the normal hazard of such employment, and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees. Nothing in this Section shall apply to employment in private domestic service or to agricultural field occupations.” (emphasis added)
The proper standard for liability predicated upon a delegation of the statutory duty to provide a safe place to work which would absolve an executive officer from some personal liability and transfer that personal liability to the person to whom authority was delegated, was outlined by the Louisiana Supreme Court in Canter v. Koehring Co., 283 So.2d 716 (1973):
“1. The principal or employer owes a duty of care to the third person (which in this sense includes a co-employee), breach of which has caused the damage for which recovery is sought.
2. This duty is delegated by the principal or employer to the defendant.
3. The defendant officer, agent, or employee has breached this' duty through personal (as contrasted with technical or vicarious) fault. The breach occurs when the defendant has failed to discharge the obligation with the degree of care required by ordinary prudence under the same or similar circumstances — whether such failure be due to malfeasance, misfeasance, or nonfeasance, including when the- failure results from not acting upon actual knowledge of the risk to others as well as from a lack of ordinary care in discovering and avoiding such risk of harm which has resulted from the breach of the duty.
4.With regard to the personal (as contrasted with technical or vicarious) fault, personal liability cannot be imposed upon the officer, agent, or employee simply because of his general administrative responsibility for performance of some function of the employment. He must have a personal duty towards the injured plaintiff, breach of which specifically has caused the plaintiff’s damages. .If the defendant’s general responsibility has been delegated with due care to some responsible subordinate or subordinates, he is not personally at fault and liable for the negligent performance of this responsibility unless he personally knows or personally should know of its non-performance or mal-performance and has nevertheless failed to cure the risk of harm.” At 721.
In the instant appeal, the analysis should be applied as follows:
1. Borton, Inc. owed to Morgan P. Chris-ham the duties of providing safety devices, adopting safe methods and procedures, providing a safe place to work and safety meetings, the breach of which have caused the injury to Morgan P. Chrisham.
2. These duties were delegated to Donald Blume, who visited the work site several times daily and who was responsible for calling safety meetings, determining safeguards to be used at certain elevations, and formulating safe construction methods and procedures.
3. Donald Blume has breached the above enumerated duties by:
a. failing to hold safety meetings,
b. failing to order the use of toe-guards, guardrails, safety belts or harnesses, and secure flooring,
c. failing to formulate safe methods and procedure, and
*465 d. failing to insure that the workers were instructed in the procedures formulated.
4. Donald Blume jointly shared responsibility with Larry Faucett on one duty only, namely the elevation at which safety belts and/or harnesses were to be worn. It is apparent from the record that both should be personally liable for their failure to provide safety belts and that neither cured the risk of harm.
I agree with the majority that H. W. Arvin, P. E. Lewis, and Roy Dunn should not be held liable as executive officers due to an insufficiency of evidence within the record. However, I am firmly convinced that the actions and omissions of Donald Blume and Larry Faucett should be sufficient cause to subject them to liability as joint tortfeasors. (Although in this case, of the two, only Blume has been sued.) I note that in the case Abshire v. Hartford Accident and Indemnity Insurance Company, 289 So.2d 545 (App. 3rd, 1974), writs denied, 293 So.2d 170, our brethren on the Third Circuit applied the Canter analysis in a similar manner and found that a breach of the employment imposed duty to provide a safe place to work was a basis for executive officer liability.
Turning to the issue of manifest error, I must first note that even the length of the majority opinion belies its holding that this case presents a simple affirmation under the manifest error doctrine of Canter. If that had been the case, then the instant appeal could have been disposed of in a two-line opinion. While both the majority and myself have made numerous reviews of the record, my reviews have revealed the following.
Six witnesses were presented at the trial of this matter. The first witness was Donald Blume, a named executive officer in the suit who was the general supervisor on the job. Not only is Donald Blume presently employed by Borton, Inc., but he has worked for Borton and its predecessor company, Chalmers & Borton, since he was sixteen years old.
The second witness was Larry Faucett, who was the foreman of the four-man crew of which plaintiff was a part. Larry Fau-cett was hired by Donald Blume, has worked for Borton for 11 years, and still works for Donald Blume in the same capacity as foreman. Both Blume and Faucett were defense witnesses.
The third witness is John Catanzaro, who was employed as a laborer on the crew with Morgan Chrisham. Catanzaro was hired by Donald Blume. No indication of Catanza-ro’s present employer is contained in the record. Despite the fact that he was called by the defense, the thrust of his testimony tended to support the position of the plaintiff.
The fourth witness was Robert “Bobby” Hubbard, who was a member of the plaintiff’s crew. Hubbard was hired by Donald Blume. Hubbard was working for Borton during the semester break between school terms; at the time of the trial he was no longer employed by Borton or Blume. The thrust of Hubbard’s testimony supported the plaintiff.
The fifth witness was Warren David “Davie” Weaver who was also a member of the crew. Weaver was hired by Blume for full-time employment. The record is not clear as to his employment at the time of the trial. In any case, the thrust of Weaver’s testimony supported the plaintiff.
The sixth testimony presented was that of the plaintiff, Morgan Chrisham. Morgan Chrisham is an immigrant from County Galway Craigwell, Ireland, where he was a member of the Metropolitan Police, Scotland Yard, London. While with Scotland Yard, he was promoted from traffic duty to court duty to the Criminal Investigation Division. Mr. Chrisham left Scotland Yard to join the Navy during World War II. He served in Russia, the Atlantic Ocean, the Baltic Sea, and South Africa. He participated in the D-Day Invasion. After World War II, he studied criminology at Hinden College, London, before immigrating to America in 1947. He was also a weightlifter in Greece. This point is of some relevance to the case because the question *466 of the involvement in the accident of weights — and, if so, of the heaviness thereof — is raised in the majority opinion’s hypothetical scenario of the accident.
While in the United States, he has worked for the Department of City Service in St. Rose, Standard Coffee, Co. and the Bunge Grain elevator. While at Bunge, Chrisham was involved in the famous Grain Elevator Explosion. Despite being thrown from the fourth floor, Mr. Chrisham emerged from the explosion unscathed. He then participated in the rebuilding of Bunge, which led to his employment with Borton.
It is noteworthy, in summary of the posture of the various witnesses, to note that the testimony of four witnesses (two' of whom no longer work for the Borton Company) tend to support the plaintiff’s position. Only two witnesses — Blume and Fau-cett — gave testimony supportive of the defense and both of them still work for the Borton Company, the latter witness (Fau-cett) having been hired by the former. Furthermore, there are consistent indications in the record, that — contrary to his testimony — Faucett (supposedly the supervising foreman at the site) actually was not even at the scene when the accident occurred. This, in view of the substantial testimony about the pre-occupation of each of the employees in their work, underscores the total lack of supervision of employees engaged in a clearly dangerous job.
Petitioner contends that he was on top of the scaffolding hauling iron.[3] While he was engaged in this activity, the iron began to “whip.” Simultaneously, one or more of the boards composing the floor of the scaffolding twisted or separated. The weight and speed of the erratic movements of the iron created a momentum which, when combined with the moving flooring, caused Morgan Chrisham to be pulled or catapulted from atop the scaffolding. This explanation of the accident is more in accord with the effect of the heavy weight described by plaintiff than with any possible effect of the relatively light weight in the majority opinion’s conception of the accident.
Curiously enough, in the face of Chris-ham’s highly detailed description of his actions on the scaffold — and the corresponding reactions of parts of the scaffold structure itself — the majority opinion adopts the trial judge’s conclusion that Chrisham was not even on the platform, that he simply “fell backwards” off the ladder after “losing his grip”. To have reached such an unlikely conclusion, in the face of evidence to the contrary, is one of the major elements of the trial judge’s manifest error, and, correspondingly, one of the major instances of the majority opinion’s manifest error in its essentially unrealistic reconstruction of the accident.
Chrisham fell a distant of 10 to 14 feet landing directly on his heels. Both feet, ankles, and substantial parts of both legs were shattered on impact. Mr. Chrisham has had four major operations and is permanently and totally disabled.[4]
Morgan Chrisham testified as follows:
*467 . .1 was standing on the board near to where I was holding up the iron from Weaver. I would be standing on the inside board. And that way I can pull the board and that way I was pushing along, and it was all the time coming over the edge, and just when I thought myself it was halfways about, it whipped me off. And the inside board of the platform which was not properly secured, any of them three boards were not properly secured on that day, and the reason is this: Usually they secured into place by the Borton people, but they couldn’t secure them because of the breakage in the wall and the finish, and they had nothing to clamp onto it on that side. This side, yes. And the three boards was separating and there was a clamp on one side, nothing at all on the other side, and as a result it whipped with so I landed straight on my feet. I can’t explain. My way of speaking is affected because I can’t . . .” Tr. p. 106. (emphasis added)
The majority makes a great tempest in a teapot over the plaintiff’s statements that he “thought” the boards slipped. A thorough examination of the course of this meteorologic disturbance is in order. Below is presented every reference to “slipping boards” found in plaintiff’s trial testimony, excluding the quote above:
******
“Q. And it is your testimony when you got it part of the way up it began whipping?
A. Yes.
Q. The bottom end started moving up and down?
A. I don’t know if it was one-eighth or one-quarter — let’s say a quarter — it goes like that. When it reaches a certain ■point it started to whip. And something happened to the board when it whipped.
A. And you say the board whipped and you were thrown off the— .
Q. The only thing I know, it whipped and I went down. I know one thing: My feet on the board — and the board let go underneath me. I’ll tell you the trúth. I think myself because the board was secured not at all next to the wall, and by pulling the iron up, the board pushed along with me at my feet, and I think that’s what happened.
Q. But you don’t know that —
A. I don’t.
Q. But you did feel the metal moving— as you put it, whipping in you hand?
A. I tell you one thing: I would say that approximately — I don’t know — about 100 pounds — with that end pulling it and the whipping, and I tell you, you’ve got to. hold on. You don’t get much attention. It takes a great deal of work.
Q. Did you feel the metal slipping from your hands or did you let go of the metal when you felt yourself falling?
A. No. I would say I had control of all the metal, but the platform that slipped underneath me — that’s what I think. It was so quick. I came down so quick, Nobody even knew I was there.
Q. But my question is you still had both hands on the metal?
A. I had to have.
Q. And you were kneeling or bent at. the knees?
A. Bending, trying to pull it.
Q. And you were pulling it up and it started whipping and you fell forward?
A. I didn’t fall forward. If you will, I thought that the board — it either slipped or twisted. I don’t know what it did. And the next thing was the thing whipping must have whipped me and the next *468 thing I was on the floor. It came so fast. I don’t know.
* *' * * # *
,Q. You told me you were pulling up the metal over the side of the scaffold board ?
A. Yeah.
Q. And you got it about halfway up and had both hands on the metal[5] and you felt something either slip under yo ur feet or the board was — or the metal — was whipping? You’re not sure which it is, are you?
A. No, I’m sure which it is. You’re not giving me that right. The metal was whipping and the board slipped. This is true. By belief, by that very action of pulling me forward — pulling that iron forward — it moved with me and eventually came off the other end and down.
Q. Did you go straight down or did you have to go forward to get over the boards?
A, Yes. There’s no boards over — that’s it. When the iron is pulling you, you’re landing with the iron. The iron has the weight, 100-pound weight, there to pull you, take you straight down to the floor.[6] Tr. pp. 127-130. (emphasis added)

Q. Are you saying that the boards on which you were standing — you’re sure it didn’t move in the direction of the metal you were pulling up?
A. It moved with me. You’re pulling up the metal and you’re standing on the board, and instead of the metal standing still, positioning on this end, the big boots I had — the boots — when you walk and pull at the knees the board came with you and down you went. That’s what happened. Now, if the board fell down, I don’t know. The thing is that the whipping brought me down.
Q. You said the boards were not secured, I’ll ask you again since we have been through the diagram, and maybe I have a better understanding of what you meant. What do you mean by not secured?
A. Not■ secured — they wasn’t secured other than laying on the wall on the far end and the southwest end. They were laying on top on this end but not on that end. So between, you come over here— you come down.
Q. You said they were laying on top on one end but not on the other endl
A. The point you’ve got to remember— the one board was laying on the wall coming this way.
Q. What was the end of that board resting on ?
A. Nothing.
Q. Were you standing on that board?
A. Standing there for one reason: You had — you had the metal support standing here crossways, and you had the metal support standing here, and the rest went toward the wall. Insofar as that board is concerned you could have walked right across it. But what happened when the weight of the hundred pounds of metal came over, it must have been moved over and down I went. That’s what happened, I believe, I won’t say for sure. But that’s what I say. I don’t know. I tell you the truth.
Q. A lot has happened since this accident to you—
*469 A. A lot’s happened to all of us. I can say all the witnesses here including you own witness.
Q. Isn’t it fair to say you don’t really have a clear recollection of what happened that day?
A. I have a clear recollection what happened to me and I have a clear recollection of everything outstanding that happened to me during my life. I’m talking about outstanding things, and I consider the breaking up of my body in this case is an outstanding event.
Q. Alright. Just a couple more questions, I believe. You’re standing on the — I call it — you call it the inside board and I say outside board because it’s the one closest to the scaffolding.
A. Okay.
Q. You were standing on the outside board and bent at your knees and I suppose you were bent at your waist somewhat as I'm standing here ?
A. In a crouched position.
Q. Like this?
A. I don’t know.
Q. Kind of like sitting on a bar-stool type situation ?
A. Just say exactly as you were.
Q. Like this ?
A. Fes.
Q. And you’re pulling up this rope with the piece of metal and you finally get the metal and you’re holding it in both hands and it starts whipping with you?
A. Not straight away. You pull it in a little bit.
Q. And then it starts whipping with youl
A. Yes.
Q. And something happens to the board you’re standing on ?
A. Yeah:
Q. And did you fall in the direction that you were pulling or not?
A. You’re asking me questions that I don’t know for the very simple reason it was too fast.
Q. You don’t have any recollection?
A. The only thing I remember is landing on my feet on the floor.
Q. Did you go down when you landed?
A. No.
Q. Did Mr. Weaver catch you and prevent you from falling?
A. Yes. I was rocking.” Tr. pp. 156-158 (emphasis added)
The record reflects that Mr. Chrisham’s doubt is in reference to the direction in which he fell, not whether the boards slipped. In fact, every witness except Donald Blume testified that the boards were not secured. Even Larry Faucett testified that the boards were not secured at the time of the accident:
“Q. Do you know whether or not the boards were secured in some manner to each other?
A. No, they wasn’t.
sf: # * Jff Jf: ¡it
Q. If the testimony here was to the effect that there was a two by four that was nailed to secure each board to each other board would it be incorrect?
A. They was not nailed together.” Tr. p. 196.
The majority further points to the direction in which Mr. Chrisham was allegedly facing after the fall. All testimony indicates that he was “rocking” back and forth on the shattered heels and could have fallen in any direction. In fact, Chrisham was caught by Dave Weaver and lowered to the ground by Dave Weaver. Thus all testimony stating the direction in which Chrisham was facing while lying on the floor only indicates where Chrisham was placed by Dave Weaver. There is no testimony indicating the manner in which Dave Weaver caught Chrisham. Was it forward, backward, on an angle, overhand, or underhand? With these questions still unanswered, I cannot give any significant weight to the direction in which Morgan Chrisham was facing. Yet the “direction” in which Chris-ham was facing — in the majority opinion’s *470 rationale — literally is one of the pillars of that opinion.[7]
Dave Weaver testified that on the date of the accident, he was working on the ground, tying materials which were hauled by the three men on the scaffolding. He was the only man assigned to work on the ground. He testified that he saw the petitioner standing on the scaffolding seconds before the accident. Mr. Weaver turned away from the scaffolding and was tying another piece of material on the rope when the petitioner was falling. Although he did not actually see the petitioner’s downward flight, Mr. Weaver heard a noise and the petitioner’s hand hit Mr. Weaver’s back. Weaver turned around, grabbed the petitioner, and helped him to a seated position.
Weaver further testified that the foreman, Larry Faucett, was not at the accident site.[8] In fact, the first foreman on the scene was Glenn Hammond, who was alert *471 ed by Weaver’s yells for help. Hammond was the foreman of a crew working in the same general area. Weaver stated that “I had to holler a good bit to get any attention from around there.”
Mr. Weaver stayed with the petitioner the entire time after the accident, except for a few seconds, up to the time that Chrisham was carried off. He does not remember Mr. Blume at the accident scene.[9] He further states that neither Larry Faucett nor Donald Blume asked him how the accident occurred nor was he contacted pursuant to an investigation by them. Mr. Weaver never attended a safety meeting of participated in a safety program. In fact, he did not believe that Borton had a general safety program. He further testified that there were no safety devices in use.
Bobby Hubbard testified that he was on top of the scaffolding and that the petitioner was standing behind him on the scaffolding at the time of the accident.
“A. I was on top of the scaffolding and we waiting for some pieces to come up so that we could hook it onto the beulah, and I thought Mr. Chrisham was on behind me, .
‡ ‡ ‡ ‡
Q. Do you know where Mr. Chrisham was ?
A. I thought he was behind me, I didn't see him when he fell, but I thought he was behind me when it happend.” Tr. p. 91 (emphasis added)
“Q. If Mr. Chrisham was there you had your back to him?
A. The last time I talked to him he was right behind me on the scaffolding and I turned away and was working with John so that’s the last time I had seen him was behind me.” Tr. p. 91. (emphasis added)
Hubbard further testified that the boards composing the flooring were “just laid on top.” No guard rails or safety harnesses were used. He had never attended a safety program at Borton. After the accident, Bobby Hubbard was with Morgan Chrisham until Chrisham was brought downstairs on the stretcher. Mr. Hubbard was never questioned about the accident at Borton.
Hubbard further corroborated the testimony of every other witness, except that of Donald Blume and Larry Faucett, when he stated that the management did not provide the workers with any safety procedures relative to lifting heavy sections[10] and that any “procedure” used was established by the workers.
“Q. Mr. Hubbard, you indicated under cross-examination that you knew that if an individual person attempted to lift one of those beulah sections it could pull him off the scaffold?
A. It could, you had to very careful if you started to raise it yourself.
Q. You further testified that a procedure had been established where more than one man attempted to raise the heavy plates, is that correct?[11]
A. Yes, sir.
Q. Now, do you know of your own knowledge whether or not anybody explained to Mr. Chrisham on the date of the accident what that established procedure whs?
A. No.
Q. On the day of the accident?
A. No, sir. It was just something we did ever since the beginning of the whole job.
Q. Did you hear of any body working in your group tell him what that established procedure was?
A. No.
Q. Do you know whether or not your foreman Larry explained that procedure ?
*472 A. I don't believe any procedure was talked about.
Q. Did Larry know what your procedure was?
A. He didn’t say anything one way or another about the way we were doing it at the time.
Q. What about Mr. Blume?

A. Mr. Blume never said anything as to procedure.

Q. Were you ever instructed not to lift one of those heavy sections individually?
A. No.” Tr. p. 98 (emphasis added)
The defendant, Donald Blume, provided the court with the following story, a narrative essentially contradictory to the testimony of most of the witnesses and simultaneously, curiously consistent at every crucial point, with the interests of his employer and with the testimony of Faucett, also employed by Bor ton:
At the time of the accident, Mr. Blume was in the company office. He testified that someone informed him that an accident had occurred. Mr. Blume proceeded to the accident site. When he arrived, Blume testified that the petitioner said, “It’s all my fault. I just turned loose.” Blume states that this admission was made in the presence of Larry Faucett and several workmen who allegedly heard this utterance.[12] Blume testified that he interviewed petitioner’s co-workers as part of a post-accident investigation,[13] which he used as a basis for the accident report.[14]
Mr. Blume further testified that the only safety device in use at the time of the accident was the scaffolding on which the men were working. He stated that a two-by-four was customarily used to secure the flooring. (Here, however, even the otherwise faithful Faucett did not testify to the same effect.) Finally, Mr. Blume testified that he conducted monthly mandatory safety meetings[15]. No records whatsoever of the meetings were ever made, confirming universal testimony of the employee-witness that no such meetings ever were conducted.
The only person who corroborates Donald Blume’s testimony to any extent is his employee, Larry Faucett. Indeed, the only person who corroborates Faucett’s testimony is his employer, Donald Blume. Both of them, in contradistinction to most — if not at all — of the witnesses whose testimony is contrary to theirs and supportive to the plaintiff, still work for the Borton Company.
Faucett stated that Hubbard, Catanzaro, Weaver, and the petitioner were working on the scaffolding on the date of the accident. Mr. Faucett did not see the accident. He testified that he was on the ground engaged in conversation when he heard a noise. He said that he turned around and observed Weaver helping the petitioner to a seated position. “He was almost in a sitting position when I seen him.” Faucett said that he had seen the petitioner immediately prior to the accident. He further testified that the petitioner had begun climbing the scaffolding prior to the commencement of Mr. Faucett’s conversation.
Mr. Faucett admitted that the boards composing the scaffolding floor were not nailed together. He further stated that there were no guard rails on the scaffolding and no safety devices were in use. Although safety harnesses were on the work premises, they were not in use at the time of the accident. Larry Faucett further said that he and Donald Blume determined the elevations at which safety harnesses were to be used.
Faucett testified that safety meetings were held once or twice a month as needed. However, he could not recall when the last *473 meeting prior to the accident had been held. Nor, he admitted, had he ever received a written notice or memo on job safety from Donald Blume.
Although exceedingly vague concerning the existence of company safety methods and safety meetings, foreman Faucett revealed a sharp ear for recalling the unlikely. In choreographic detail he corroborates Donald Blume’s allegation that the claimant said, “It’s all my fault. I just turned loose . . . ” These two witnesses, each of whose presence at the scene was made questionable by the testimony of the other witnesses, seems to have remembered with precision what no other witness heard at all. Faucett. also states that he aided Blume in interviewing petitioner’s co-workers in their apocryphal “post-accident” investigation — another piece of mutual testimony which no one else recalls at all.
It is of crucial importance to note at this point that a 11 of the other witnesses testified:
1. That Larry Faucett was not even present at the time of the accident.
2. That no safety meetings had ever been held.
3. That they had never received any instruction relative to safety procedures.
4. That they were never interviewed by Blume and/or Faucett about the accident.
5. That no guardrails nor safety harnesses were in use at the time of the accident.
6. That Donald Blume and/or Larry Faucett determined the elevation at which guardrails and safety harnesses were to be used.
Additionally, Chrisham denied that he ever made the statement, “It’s all my fault. I just turned loose,” and none of the witnesses except Blume and Faucett testified that the statement was ever made.[16]
The defense contends that as there were no “eyewitnesses” to the accident, the petitioner failed to carry his burden of proof. I strongly disagree. While petitioner has the burden of showing by a preponderance of the evidence that the accident and disability were work connected, Guillory v. New Amsterdam Casualty Co., 244 La. 225, 152 So.2d 1 (1963), the testimony of an employee alone may establish a work-related disabling accident where such testimony is corroborated by other credible evidence. Wright v. Red Ball Motor Freight, Inc., 315 So.2d 344 (La.App. 1st, 1975); Dragon v. Orleans Parish School Board, 347 So.2d 306, (La.App. 4th, 1977). In the instant case, I find that plaintiff’s testimony is clearly corroborated by other credible testimony, most significant being the testimony of David Weaver and Bobby Hubbard, who place Mr. Chrisham on top of the scaffolding seconds before the fall. ■
The majority was correct in its assertion that no safety experts were presented at trial. However, while specifically stating that no experts were presented, the majority then accepted the lay opinion testimony on the question of industry standards for safety belts, guardrails, safety meetings- and procedure.[17]
In accepting the lay opinion testimony on the question of industry standards, the majority may have dug for themselves a perilous pit. The question of industry standards having been raised in this case, I feel free, *474 indeed compelled, to take judicial notice of the following industry standards and requirements formulated by the OSHA and contained within the OSHA regulations:
“Subpart C — General Safety and Health Provisions
§ 1926.20 General safety and health provisions.
(a) Contractor requirements. (1) Section 107 of the Act requires that it shall be a condition which is entered into under legislation subject to Reorganization Plan Number 14 of 1950 (64 Stat. 1267), as defined in § 1926.12, and is for construction, alteration, and/or repair, including painting and decorating, that no contractor or subcontractor for any part of the contract work shall require any laborer or mechanic employed in the performance of the contract to work in surroundings or under working conditions which are unsanitary, hazardous, or dangerous to his health and safety.
(b) Accident prevention responsibilities:
(1) It shall be the responsibility of the employer to initiate and maintain such programs as may be necessary to comply with this part.
(2) Such programs shall provide for frequent and regular inspections of the job sites, materials, and equipment to be made by competent persons designated by the employers.
(3) The use of any machinery, tool, material, or equipment which is not in compliance with any applicable requirement of this part is. prohibited. Such machine, took, material, or equipment shall either be identified as unsafe by tagging or locking the controls to render them inoperable or shall be physically removed from its place of operation.
(4) The employer shall permit only those employees qualified by training or experience to operate equipment and machinery.
ífc $ Ht $ $ ¡J«
§ 1926.21 Safety training and education (a) General requirements. The Secretary shall, pursuant to Section 107(f) of this Act, established and supervise programs for the education and training of employers and employees in the recognition, avoidance, and prevention of unsafe conditions in employments covered by the act.
(b) Employer responsibility.
(1) The employer should avail himself of the safety and health programs the Secretary provides.
(2) The employer shall instruct each employee in the recognition and avoidance of unsafe conditions and the regulations applicable to his work environment to control or eliminate any hazards or other exposure to illness or injury.

1926.451(a)
(4) Guardrails and toeboards shall be installed on all open sides and ends of platforms more than ten feet above the ground or floor except needle beam scaffolds and floats . . . Scaffolds four feet to ten feet in height, having a minimum horizontal dimension in either direction or less than 45 inches, shall have standard guardrails installed on all open sides and ends of the platform.
(5) Guardrails shall be two by four inches or the equivalent, approximately 42 inches high, with a midrail, when required. Supports shall be at intervals not to exceed eight feet. Toeboards shall be a minimum of four inches in height. (12) All planking of platform shall be overlapped (minimum 12 inches) or secured from movement.
(14) Scaffold planks shall extend over their end supports not less than six inches nor more that twelve inches. '
(15) The poles, legs or uprights of scaffolds shall be plumb and securely and rigidly braced to prevent swaying and displacement.
* * # jfc * #
§ 1926.28
(a) The employer is responsible for requiring the wearing of appropriate personal protective equipment where this part indicates the need for *475 using such equipment to reduce the hazards to the employees.
(b) Regulation governing the use, selection and maintenance of personal protective and lifesaving equipment are described under Subpart E of this part.
* * * * * *
§ 1926.104(d) (Subpart E)
Safety belt ianyard shall be a minimum of one-half inch nylon, or equivalent, with a maximum length to provide for a fall of no greater than six feet. The rope shall have a nominal breaking strength of 5,400 pounds.
* * its * * *
§ 1925.451(b)
(11) Platform planks shall be laid with their edges close together so that platform will be tight with no spaces through which tools or fragments of material can fall.
(12) Where planking is lapped, each plank shall lap its end supports at least 12 inches. Where the ends of planks abut each other or form a flush floor, the butt joint shall be at the centerline of a pole. The abutted ends shall rest on separate bearers. Intermediate beams shall be provided where necessary to prevent dis-lodgment of planks due to deflection, and the ends shall be secured to prevent their dislodgment.
(13) Where a scaffold materially changes its direction, the platform planks shall be laid to prevent tipping. The planks that meet the corner butlog far enough to have a good safe bearing, but not far enough to involve any danger from tipping. The planking running in the opposite direction at an angle shall be laid so as to extend over and rest on the first layer of planking.
* * * * * *
(15) Guardrails, made of lumber not less than 2X4 inches (or other material providing equivalent protection), approximately 42 inches high, with a midrail of 1 X 6 inch lumber (or other material providing equivalent protection), and toe-boards, shall be installed at all open sides and ends on all scaffolds more than 10 feet above the ground or floor. Toe-boards shall be a minimum of four inches in height. Wire mesh shall be installed in accordance with paragraph (a)(6) of this section, when required.” (emphasis added)
The accident was clearly preventable and would have been prevented if Borton and Donald Blume had complied with the OSHA regulations — which is simply another way of saying: if Blume and Faucett had not been negligent as alleged in plaintiff’s petition and in the foregoing part of this dissent. Indeed the OSHA regulations were promulgated to protect workers from exactly the type of harm found in the instant appeal. The fact that every witness except Faucett and Blume testified that no safety meetings were held, that safety belts were never used at ten feet and that no guardrails were ever used only proves that Bor-ton and Blume continually had violated the OSHA regulations.[18]
The OSHA safety regulations were provided to aid the employer in creating and maintaining safe working conditions, as well as to protect the worker from an unscrupulous employer who found that it was more economically feasible to buy a workmen’s compensation insurance policy (a deductible business expense), than to provide his workers with safe conditions.[19] Donald Blume and Borton, Inc. should not be al *476 lowed to avoid the clear consequences of their flagrant violation of the OSHA regulations.
The majority states that there is no contention that the defendants violated any OSHA regulations. A review of plaintiffs allegations, reprinted above at pages 462 and 463 of this dissent, reveals that plaintiff made more than sufficient allegations of OSHA violations. I remind the majority that Louisiana only requires fact pleading and that OSHA violations are implicit in the allegations reproduced above.

It appears to me that the testimony of Blume and Faucett, the main defense witnesses, places them perilously close to the bridge of perjury — if, indeed, that bridge has not been crossed and burned behind them. It is true that this evaluation is made on the basis of a review of the record — but a record which is replete with consistent testimony redounding to the benefit of the petitioner and inconsistent and highly questionable testimony on the part of the two company employees testifying on behalf of the defense.
It may be argued that a black-and-white record, in contrast to the presence of live witnesses at the trial of the finder of fact, consists merely of a collection of printed words. Nevertheless, if a record did not have an innate value of its own, as an adjunct of post-trial evaluation, then our appellate review of the facts, a unique part of the Louisiana juridical system, would have no meaning whatsoever. Conversely, the “finder of facts”, live though he may be, also may be mistaken — the ultimate rationale upon which factual review of the record is based. In this case, the single finder of facts does indeed appear to have been mistaken — and mistaken in a case in which the injured individual has been 100% disabled for the rest of his life.' In such a circumstance, it is suggested, the availability of appellate review of the record represents an opportunity not universally available to undo an injustice unintentionally done at the trial level.
Furthermore, the entire concept of according a degree of weight to the conclusion of the fact finder at the trial rests upon his ability to see and hear the witnesses testify in person and, presumably thereby, to better evaluate their veracity. In this particular case, however, the trial judge reversed his accolades — with regard to sincerity and apparent veracity as a witness — solely for the petitioner. In his written reasons for judgment he stated:
“ . . . This Court has impressed with the plaintiff’s seemingly honest and sincere version of the accident. However, the testimony of Weaver, Hubbard, Ca-' tanzaro, Faucett and Blume do not lend corroborative evidence to plaintiffs version but tend to indicate the accident occurred in an entirely different manner. Hence, plaintiff has not shouldered the burden of proof necessary to have any defendant cast as negligent.”
In my considered regard, an objective and extensive review of the record indicates that there should have been judgment for the petitioner and against the defendants. As indicated in the foregoing pages of this dissent, the accumulation of evidence supporting Chrisham’s petition was substantial, the accumulation of evidence as to the negligence of the defendants was overwhelming. In that general regard, manifest error is represented in the judge’s ultimate finding of fact.
More specifically, the specific conclusion of the trial judge to the effect that “the testimony of Weaver, Hubbard, (and) Ca-tanzaro ... do not lend corroborative evidence to the plaintiff’s version” is thoroughly erroneous. To the contrary, as detailed above, their testimony systemati *477 cally corroborates plaintiff’s version and discredits the defense version of the accident. Here we find an even more specific example of the manifest error on the part of the trial judge.
For reasons set forth above, I find that the conclusions of the trial judge were manifestly erroneous. Hence, the judgment should be reversed with a finding for petitioner, Morgan Chrisham, as prayed for, and against the co-defendants, Donald Blume and The Traveler’s Insurance Company.

. Although the case was captioned with the spelling “Blum,” the man’s name is properly spelled “Blume.” See: Answers to interrogatories filed January 18, 1977.

. See also Louisiana Workmen’s Compensation Law by Wex Malone (West Publishing Co., 1951) pp. 3-5.

. The majority obviously believe that the piece of metal in question was simply an angle iron, which weighed only 30-40 pounds. The weight of the evidence appears, rather, to indicate that the piece of metal being hauled by Chrisham was a buehler plate — which weighs approximately 100-120 pounds. (See the testimony' relative to threading the rope through the hole in the metal, and plaintiff’s statement that the object he was lifting was about 100 pounds. See transcript 42, 83, 106, 109, 111, 128, 156, 175, and 193.) That both the trial judge and the majority made the fundamental mistake of confusing the smaller angle iron with the much heavier buehler plate is evident from a study of the transcript, especially with regard to Chris-ham’s testimony. As will be explained later herein, once this becomes understood, it becomes apparent that the scenario adopted by the trial judge and the majority becomes, through the application of simple laws of physics, an absolute impossibility.

. He also suffered six minor and one major heartattacks and later fractured a hip while attempting to use a walker. The medical opinion of Dr. Gordon McFarland, Jr., Orthopedic Surgeon, is that Mr. Chrisham has 100% permanent disability. (Deposition 4/13/77, p. 11) Note: the distance of 10 to 14 feet is based on Chrisham’s testimony that his fall was from up on the platform, where he testifies he was and where one of the other workers saw him. Only a fall of such a distance — with the 100-plus *467 pound beuhler plate — could have caused such crushing injuries. Conversely, the reconstruction assumed by the trial court and adopted by the majority opinion could not have caused anywhere near such physical devastation. Their theory that he simply fell backwards while ascending the ladder (therefore a fail of a shorter distance) and while carrying in one hand the 30 to 40 pound angle iron would not — could not — have caused such equally distributed devastation throughout the lower part of his body. This obvious misunderstanding as to the only rational explanation of how Chris-ham was injured so badly is fatal to the position of the defense in this case.

. Observe the efforts of counsel to put words into Chrisham’s mouth — to get him off of the defective platform and have him simply climbing up the ladder (even so, “about halfway up,” as counsel puts it, would have amounted to a fall of only five to seven feet — rather than the 10 to 14 foot fall from the platform. Furthermore, it should be common knowledge that no man — not even a former weightlifter — conceivably could mount a ladder while carrying a 100 to 120 pound weight. Plainly, Chrisham is talking about the buehler plate with which he fell off the platform and not about any short fall off the ladder with a 30 to 40 pound weight.

. Note Chrisham’s explanation of the effect of the heavy weight pulling him straight down to the floor is — in contrast to the majority opinion’s scenario in which he simply loses his grip on the ladder and falls over backwards to the floor — the only rational explanation of his acquisition of such crushing, permanent ankle and leg injuries following the relatively short 10-foot fall to the floor.

. The majority appears to believe that the direction in which Chrisham’s body was facing gives rise to an inference of the manner in which Chrisham executed the downward flight, which in turn gives rise to an inference of his location prior to the accident. Such stra-whorse logic is preposterous. Even assuming, arguendo, that the position in which Chris-ham’s body was placed somehow related to the manner in which Chrisham’s body traveled through the air, anyone who has watched divers at a swimming pool knows that it is easily possible to do a triple somersault from a three meter board, approximately 10 feet. It is not our purpose to speculate as to the manner in which Mr. Chrisham’s body flew through the air. Since, however, the majority has called that speculation into issue, please indulge me in brief moment of speculation — to put into better perspective the rather fancified speculation of the majority’s opinion of this point. The combination of an unsecured board with a weight of 100-150 pounds creating stress at the one end counterbalanced by Chrisham’s body weight at the other end, could create a fulcrum effect, similar to a see-saw, so that as Chris-ham moved away from the balance point he would create a downward motion which would spring him upwards when the countervailing weight was released. Another possibility is that the momentum established by stepping backward, while pulling the weight would continue to carry Chrisham’s body backward when the weight was released, so that he would fall backward over the scaffolding. This action would be similar to falling backward during a game of “tug-of-war.”
In any case it is apparent that no theory of the accident resting upon the idea that Chrisham simply “fell back” off the ladder before reaching the platform can even begin to comport with the totality of the evidence. The only acceptable reconstruction necessarily must be one which, in one way or another, rests upon Chrisham having attained the platform and thereafter being thrown off of that unstable structure because of the dynamic stresses suddenly brought into play against it by the heavy weight so notably disregarded by the majority opinion. In the final analysis, none of the acceptable reconstructions of the accident could have occurred without one or the other (if not most) of the explicit instances of negligence ascribable to Blume (and to the foreman, Fau-cett).
The essential unreality of the majority opinion’s (and the trial judge’s scenario) becomes all the more apparent when it is kept in mind that the majority’s reconstruction necessarily has Chrisham ascending the ladder at the time of the accident with the 30 to 40 pound angle iron (inasmuch as it would have been virtually impossible for him to have been ascending the ladder with the 100 to 120 pound beuhler plate —with which, as a study of the record and especially Chrisham’s testimony reveals, he actually fell from the platform).
The injuries he received could not conceivably have been the result of the majority’s ladder (shorter fall) — angle iron (lighter weight) hypothesis. The petitioner landed squarely on both feet — which is consistent with a fall with a heavy weight requiring a two-handed grip and not consistent with a fall with a lighter weight, which would have been held in one hand (causing the fall to be toward one side) as would have been the case had he been in the process of going up the ladder with the smaller angle iron.
Chrisham neither landed on one side nor had his injuries all on one side — so that the landing and the injuries both are consistent with his holding the 100 to 120 pound weight with both hands, thus eliminating the trial judge’s and the majority’s “ladder-fall” theory and, conversely reinforcing Chrisham’s testimony concerning the plunge off the defective platform while hanging on to the heavy buehler plate.
In short, the “angle-iron, ladder fall” theory on which the defense case was based not only does not begin to fit the evidence concerning the results óf the fall — that theory, upon analysis, is rationally, logically, mathematically, and physically impossible. Yet it constitutes the central core of the majority opinion.

. This naturally contradicts Faucett’s dramatic testimony that — at the scene of the accident— the plaintiff (whom he claims to have last observed just beginning to ascend the ladder) said to him, “Larry, I’m sorry. I just let go.”

. And this contradicts Blume’s equally dramatic recollection that, at the scene of the accident, the plaintiff said: “It’s all my fault. I just turned loose.”

. Indeed, the workers were not even provided with pulleys, “come-alongs” or blocks and tackles to aid in the lifting of the metal.

. Here, we have virtual testimony that the “heavy plates” — such as the beuhler plate with which, as the testimony consistently shows, Chrisham was struggling — would have never been brought up the ladder by one man.

. An utterance, so far as the record indicates, not heard by any of the other employees 'who testified.

. An investigation which, the record makes clear, never occurred.

. An accident report based solely on Blume’s recital of the events,- devoid of any accounts obtained by witnesses and signed by Blume himself.

. Once again, defense testimony totally contradicted by the weight of the evidence.

. Assuming, arguendo, the unlikely proposition that such a statement was ever made, it was hardly clearly an admission against interest. Just precisely what was “turned loose” never was clarified by the defense.

. “He (Weaver) acknowledged that safety belts were not normally used at ten foot heights and he knew of no particular safety device that should have been used.” Majority opinion p. 460.
“He (Hubbard) stated that guardrails on the scaffolding would have been impractical . . He too declared that safety belts were never used at the ten foot level.” Majority opinion p. 460.
“This witness (Faucett) opined that safety belts were impractical at a ten foot level since more slack than this would be required in the safety lines so men could move about. It would have to be disconnected everytime someone left the platform and if someone fell in all probability he would strike the floor before exhausting the slack in the safety line.” Majority opinion p. 461. (emphasis added)

. Even if I were to swallow the argument that safety belts were of no use at a distance of ten feet, then it would clearly prove that plaintiff was working at a more dangerous level. If he were working at a greater elevation, he would have had the Borton supplied safety belts as •protection. Where an employer puts his employee in a position of undisclosed danger, the employer is liable to the employee injured thereby. Pfister v. Phoenix of Hartford Insurance Company, 290 So.2d 362 (App. 4th, 1974), writs denied, 293 So.2d 187.

. “A survey conducted by the Bureau of Labor Statistics showed that 80% of scaffold accidents were falls, with more than half resulting in contusions, fractures, and strains. Ah evaluation of the scaffolds in use at the time of the accidents showed that 67% lacked guardrails, more than half lacked toeboards, 86% had no overhead protection, and 45% had at *476 least one unsafe condition, primarily unsecured or loose planks. Of the employees injured in the accidents, 79% worked in construction, 6% in skilled trades — mostly carpenters, followed by bricklayers and painters. About half the injured workers were not wearing or using protective equipment, and about 25% had not been trained to install work platforms or to assemble and inspect the scaffolds” Best’s Safety Directory-1980, Vol. II (A.M. Best Co., Aldwick, New Jersey) p. 1151.